IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

—————————————————————

AMANDA HOSKINS AND JONATHAN TAYLOR,

Plaintiffs-Appellants

v.

JASON YORK, et al,

Defendants-Appellees

—————————————————————

On Appeal from the United States District Court for the Eastern District of
Kentucky, London Division
District Ct. No. 6:17-cv-0084
Hon. Judge Wier Presiding

—————————————————————

**BRIEF OF APPELLANTS AMANDA HOSKINS AND
JONATHAN TAYLOR**

Jon Loevy*
Elliot Slosar
Amy Robinson Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900
*Counsel of Record*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1, Plaintiffs-Appellants make the following disclosures:

     1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

     No.

     2.    Is there a publicly owned corporation, not party to the appeal that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

     No.

                      /s/ Jon Loevy_____
                      Counsel of Record for Plaintiffs-Appellants
                      Amanda Hoskins and Jonathan Taylor

Jon Loevy
Elliot Slosar
Amy Robinson Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................... v

STATEMENT OF JURISDICTION ........................................................... 1

ISSUES PRESENTED ............................................................................... 1

STATEMENT OF THE CASE ................................................................... 2

SUMMARY OF THE ARGUMENT ......................................................... 33

ARGUMENT .............................................................................................. 34

I.    The District Court Erroneously Prevented Plaintiffs From Proceeding With Their Fabrication Count ...................................................................... 34

    A. Legal Review Is *De Novo* .......................................................... 34

    B. The Record Here Amply Supported Plaintiffs' Section 1983 Fabrication Claim ......................................................................... 34

    C. The District Court Erroneously Concluded That This Circuit Does Not Recognize A Fabrication Of Evidence Claim Independent Of Malicious Prosecution ................................................................. 37

II.   The Jury Instructions Erroneously Barred The Jury Not Only From Inferring Whitehead's Guilt, But From Even Considering It To Prove Plaintiffs' Claims ........................................................................... 40

    A. Legal Standard .......................................................................... 41

    B. The Court's Fifth Amendment Instruction Got The Law Exactly Backwards ................................................................................. 41

i

    C. The Court Compounded The Error By Also Instructing Jurors They Were Not Allowed To Consider Whitehead's Guilt When Assessing The Legitimacy Of York's Witness Statements Implicating Plaintiffs..............42

III.  In Light Of York's Empty Chair Defense Regarding The Suppressed Whitehead Report, The Court Erroneously Prohibited Plaintiffs From Informing The Jury The Full Extent Of The Withholding...............................47

    A. York Was Permitted To Unfairly Blamed The Empty Chair......................47

    B. The Court Improperly Barred Evidence That The KSP Is To This Day Actively Trying Not To Solve The Crime...................................................51

IV.  The Court Erred In Barring Plaintiffs From Eliciting Evidence Of York's Numerous Lies To The Grand Jury.....................................................................52

V.  The Court Erroneously Excluded Critical Rule 404(b) Evidence That Could Have Changed The Trial Result..........................................................................54

VI.  The Court Erred In Allowing The KSP To Intimidate Jurors...........................56

Conclusion.................................................................................................................57

Addendum .................................................................................................................67

## TABLE OF AUTHORITIES

*Avery v. City of Milwaukee,* 847 F.3d 433 (7th Cir. 2017) ........................ 40

*Ayers v. City of Cleveland*, 773 F.3d 161 (6th Cir. 2014) ........................... 46

*Baxter v. Palmigiano,* 425 U.S. 308 (1976) ................................. 41

*Bilokumsky v. Tod,* 263 U.S. 149 (1923) ....................................... 41

*Clark v. Abdallah,* No. 21-10001, 2023 WL 4852230 (E.D. Mich. July 28, 2023) ... 38

*Cole v. Carson,* 802 F.3d 752 (5th Cir. 2015) ............................... 40

*Dennis v. Sparks,* 449 U.S. 24 (1980) ........................................ 53

*France v. Lucas,* 836 F.3d 612 (6th Cir. 2016) ........................... 39

*Grange Mut. Cas. Co. v. Mack,* 270 Fed.App'x 372 (6th Cir. 2008) ........................ 49

*Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir. 2006) ................................... 45

*Halsey v. Pfeiffer,* 750 F.3d 273 (3d Cir. 2014) ........................... 44

*Hoxie v. D.E.A.*, 419 F.3d 477 (6th Cir. 2005) ........................... 41

<u>*In re Flint Water Cases*</u>, 53 F.4th 176 (6th Cir. 2022) ........................... 41

*Jackson v. City of Cleveland,* 925 F.3d 793 (6th Cir. 2019) ........................ 39

*Manuel v. Joliet,* – U.S. –, 137 S.Ct. 911 (2017) ........................... 38

*Marshall v. Randall,* 719 F.3d 113 (2d Cir. 2013) .................................. 54

*McDonough v. Smith,* 139 S. Ct. 2149 (2019) ................................ 38

*Mills v. Barnard,* 869 F.3d 473 (6th Cir. 2017) ........................... 39

iii

*Mott v. Mayer,* 524 F. App'x 179 (6th Cir. 2013) ...................................................... 39

*Price v. Montgomery County,* 72 F.4th 711 (6th Cir. 2023) ..................................38, 39

*Rehberg v. Paulk,* 566 U.S. 356 (2012) ...............................................................53, 54

*Stemler v. City of Florence,* 126 F.3d 856 (6th Cir. 1997) ........................................38

*Unger v. Bergh*, 742 F. App'x 55 (6th Cir. 2018) ....................................................53

*United States v. Harvey*, 653 F.3d 388 (6th Cir. 2011)..............................................44

*United States v. Joseph,* 270 Fed.Appx. 399 (6th Cir. 2008) ...................................56

*Webb v. United States,* 789 F.3d 647 (6th Cir. 2015)...............................................38

*Weiland v. Palm Beach County,* 792 F.3d 1313 (11th Cir. 2015) ..............................40

**STATUTES**

Ky. Rev. Stat. § 16.185 .................................................................................................50

## STATEMENT IN SUPPORT OR ORAL ARGUMENT

Plaintiffs' request oral argument given the complexity of the issues and the magnitude of the stakes for the parties.

## STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 28 U.S.C. 1331 and 1367. Following trial and entry of judgment on the jury's verdict on March 24, 2022, R.397, Plaintiffs' Rule 59 motion was denied on March 20, 2023. R.403. Plaintiffs timely filed their notice of appeal on April 12, 2023. R.404.

This Court has jurisdiction pursuant to 28 U.S.C. 1291.

## ISSUES PRESENTED

1. Whether the district court committed legal error in concluding at summary judgment that Plaintiffs' primary Section 1983 count – for fabrication of evidence – was not a recognized claim, and thus could not proceed to trial.

2. Whether the court erred at trial in expressly limiting the jury's consideration of evidence identifying the true perpetrator of the crime for which Plaintiffs were wrongfully convicted, thereby preventing Plaintiffs from establishing that evidence of their supposed "confessions" to the same crime to eight other people was in fact false and manufactured by the Defendant.

3. Whether the court erred in refusing to impose any consequences after Plaintiffs fortuitously discovered days before trial that Defendants had for five years covered up evidence showing that someone else committed the crime for which they were wrongfully prosecuted, thereby effectively preventing discovery on the subject.

4.     Whether the district court erred in barring Plaintiffs from referencing in any manner at trial the numerous intentional lies Defendant told to the prosecutor and grand jury.

## STATEMENT OF THE CASE

Plaintiffs Amanda Hoskins and Jonathan Taylor filed this Section 1983 action in 2017, alleging that various law enforcement officers fabricated their supposed confessions to a murder they had nothing to do with. R.1. When evidence of Defendants' fabrications came to light, the criminal case against the Plaintiffs collapsed, and they were released from jail – but only after spending years wrongfully incarcerated. The true perpetrator was eventually identified.

A civil jury trial proceeded in March of 2022 against Defendant Jason York, a detective for the Kentucky State Police (KSP). The jury found for the Defendant, and this appeal followed. The factual record is summarized as follows.

### John Whitehead Murders Katherine Mills

On December 20, 2010, a drug-addicted drifter named John Whitehead robbed and then beat to death a woman named Katherine Mills in her home in Stinking Creek, Kentucky. R.416, Trial Tr., PageID#25923. Mills had recently received more than $20,000 selling timber to a nearby mill at which Whitehead's relative worked, P's Trial Ex. 1, Inv. File, PageID#24399; R.417, PageID#26216, and there was scuttlebutt all around town about how Mills kept a lot of cash in her home. R.413, Trial Tr.,

PageID#25194.[1]

The Mills murder investigation was assigned to York. Surveying the scene, he deduced – correctly, as it turned out – that the killer had intentionally arranged five $100 bills near the body to throw off investigators (by making it appear that robbery was not the motive). R.418, PageID#26530. York sent the bills for fingerprinting. *Id.*

More than six years later, a fingerprint match came back to Whitehead, who had a lengthy rap sheet and a history of violent attacks against women. R.356, PageID#22308. When subsequently asked by an investigator why his prints would be at the scene of Mills' murder, Whitehead claimed that he was in a drug-induced haze during this period of his life. R.412, PageID#24782. But he admitted living in the area at the time, and did not deny committing the crime. R.412, PageID#24782, 24797. To this day, Whitehead has never denied killing Katherine Mills. R.416, PageID#25921-23.

### The Plaintiffs' Innocence

Co-Plaintiff Amanda Hoskins, age 37, lives with her husband and three children. She works at Appalachian Children's Home, a group home for troubled kids. R.416, PageID#25925.

---

[1] Hereafter, unless otherwise indicated, all remaining citations are to the trial transcript.

Amanda's cousin, co-Plaintiff Jonathan Taylor, age 34, has learning disabilities. He dropped out in the tenth grade to work at a grocery store, wrapping produce. R.413, PageID#25050-25055. When he was in his early 20s, he was in a near-fatal car accident that left him disabled with a permanent limp. *Id.*

Neither Amanda nor Jonathan had anything to do with the robbery and murder of Katherine Mills. R.413, PageID#25064; R.416, PageID#25938-39. They do not know Whitehead, and were not involved in any way in his crime. They are completely innocent. *Id.*

Despite their innocence, Plaintiffs spent more than eight combined years in jail awaiting trial for the Mills murder, a capital offense for which they faced the death penalty. R.413, PageID#25083,25100; R.416, PageID#25968.

The case eventually fell apart. There was no genuine evidence against them, and, as described below, the only evidence that did exist was fabricated. The Commonwealth prosecutor ultimately determined he had an ethical duty to drop the charges in the interests of justice. R.411, PageID#24683.

### The Delayed Identification

Unfortunately, the fingerprint match to John Whitehead was not discovered until six-plus years after the murder. R.412, PageID#24767. In the intervening years, York made a giant mess of the investigation, violating Plaintiffs' constitutional rights in the process.

## York's Initial Investigation

This was York's first case. R.418, PageID#26614. He had no training prior to becoming a detective, and really had no idea how to conduct investigations. R.412, PageID#24789-90.

York started by interviewing Jesse Lawson, the victim's grandson-in-law. R.417, PageID#26170. York's tactics were heavy-handed, to say the least. Days after Mills was killed, York kicked in Lawson's door while his family was sleeping. R.417, PageID#26184. Yelling and swearing profusely, York took Lawson to an interrogation room at the station, where he invaded Lawson's personal space, screaming from so close that York was effectively spitting in Lawson's face. *Id.*, PageID#26190-94.

York was trying to get Lawson to confess to the crime. Lawson refused, because he was innocent, but York would not accept his denials. *Id.* After a violent noise on the tape-recorded interview, Lawson accuses York of "slamm[ing] him," and York yells back: "Yeah, and I'll do it again." P's Trial Ex. 72(a), Lawson Video, PageID#24417. On this and other occasions, York threatened Lawson with jail, and even death, forcing him to wear a wire to try to implicate someone named Cleo Brown. *Id.* PageID#26196-97. Lawson was so terrified that he thereafter kept a note in his boot because he was afraid that York was going to kill him. R.414, PageID#25421.

Another of York's early suspects was Michael Mills, the victim's grandson, who had stolen money from and argued with her. R.417, PageID#26183. York took a

statement from a jailhouse informant named Shawn Kinningham claiming that Michael confessed to Katherine's murder, R.411, PageID#24451, and others from Michael's friends confirming he was lying about his alibi. R.418, PageID#26558. None of the police reports relating to any investigation of Michael made it into the official file; York claimed he created none. R.411, PageID#24454.

York also purportedly obtained confessions from Jerry and Cleo Brown that they killed Mills. *Id*. PageID#24705-06. York, however, had no existing police reports on this subject either. *Id*. PageID#24705-06.[2]

None of these suspects panned out. That was because the crime was actually committed by John Whitehead. R.416, PageID#25921-22.

### York's Next Suspects:
### Mike Simpson and Allen Helton

Hours after the murder, a career criminal named Mike Simpson left town with Allen Helton in a blue rental car, driving to Florida to buy a shipment of drugs. R.418, PageID#26583-85. Per information allegedly developed by York: Simpson was broke immediately before this drug run; Simpson gave York an alibi that did not check out; and Simpson refused a polygraph about the murder. *Id.*, PageID#26584-85,94-96.

---

[2] York had other suspects too, including Hank Smith, Bradley Broughton, and the Blankenship brothers. R.418, PageID#26624-27. There are also no police reports or notes or other records memorializing why they were suspects, or what investigation of them was undertaken. *Id.*

### "Eyewitness" Crump Identifies Simpson

York developed a purported eyewitness, Michael Crump, whose route passes by Mills' home when driving his children to school. After speaking with York, Crump allegedly recalled seeing a man and a blue car (like Simpson's rental car) at Mills' property on the day of the murder. R.414, PageID#25479.

To be clear, Crump did not know Mills, and thus had no reason to make any mental note of the innocuous and nonmemorable events of who was where, or what color things were. But regardless, Crump was unambiguous that he never saw this man's face. R.414, PageID#25479-80 ("I knew it was a guy, but I never saw a face").

York nonetheless later swore a search warrant affidavit stating under oath that Crump identified Simpson as the man he saw at the victim's residence the day she was murdered. R.418, PageID#26589-90. York created two other separate search warrant affidavits, for a total of three, swearing that Crump identified Simpson as the person Crump saw when driving by Mills' home days earlier. R.200-26, Affs., PageID#10120-21;10122-23,10124-25. There is no longer any existing police report or lineup report documenting Crump's identification of Simpson.

### Allen Helton

On January 4, 2011, York pulled over Helton, the man who left town with Simpson after the murder. York grabbed Helton hard "by the face" and talked about letting people "beat the fuck out of him" for killing an old woman. R.417,

PageID#26249. York charged Helton with DUI and took him to the station for interrogation. He told Helton that he was in big trouble, and that he better tell everything he knew. *Id.*

Helton, however, had no knowledge of the murder, and was unable to relate anything helpful. *Id.* This made York angry, and he took Helton to jail. *Id.*, PageID#26253-54.

On January 12, York picked up Helton again, and had him take a polygraph about Mills' murder, which York told Helton he failed. *Id.*, PageID#26254. York kept pressuring Helton to implicate others. *Id.*, PageID#26264-67. York told Helton that he would make his DUI go away if he told York what York needed to hear. *Id.*

The investigation into Simpson and Helton did not pan out. They did not commit the crime. John Whitehead did.

### York's Next Suspect: Will Lester

York apparently heard from someone that Will Lester had once made a joke at a bar about wanting to tie up his mother-in-law (the victim) in her outhouse. R.411, PageID#24413. To be clear, the story presented to York was that Lester (who has no criminal record, R.413, PageID#25153) was making a joke in a bar. R.418, PageID#26628. Moreover, the actual crime did not involve either tying up Mills or her outhouse. And Lester loved his mother-in-law, and had a great relationship with her for many years. R.413, PageID#25152-53. Lester also had his own successful

businesses, and no financial (or other) motive to rob or kill anyone. *Id.,* PageID#
25150-51,25154-55,25191-92.

York decided to investigate Lester. He arrested Lester's sometimes-girlfriend,
Plaintiff Amanda Hoskins, and took her tape-recorded statement. On tape, York told
Amanda she was not in trouble if she just cooperated and confirmed that Lester made
the outhouse comment. She did as asked, and was allowed to go home. R.416,
PageID#25951-55; R.418, PageID#26648.

York then approached Lester and made another deal, also on tape. York told
Lester he was just a witness, not in trouble, provided he did not lie. With his lawyer
present, Lester is asked to confirm that he made the outhouse joke, which he did –
making clear that he was just kidding around. R.414, PageID#25306, 25309-25311.

When York told Lester he would not be in trouble if he just confirmed the
outhouse comment, York was lying. In reality, Lester now became York's main
suspect.

### York Pressures Amanda to Pressure Lester

In trying to make a case against Lester, York repeatedly pressured Amanda to
implicate him. York arrested Amanda at least four times, trying to get her to "flip" on
Lester. R.416, PageID#25965; *Id.*, PageID#25958-59. On one occasion, Amanda was
carrying her young child, and York literally put his gun to her forehead so hard that it
pushed her head backward. R.416, PageID#25955.

At all times, York kept trying to get Amanda to point her finger at Lester, which she would not do. R.416, PageID#25949-52. She had no knowledge of his guilt. *Id.,* PageID#25950;25953.

### York Approaches Branson
### to Pressure Amanda to Pressure Lester

On May 16, 2011, York went to speak to Christy Branson, a woman who had once briefly shared a jail cell with Amanda. R.411, PageID#24459-60. There is no documented explanation anywhere for why York came to be interviewing Branson, why he had any reason to believe she might have relevant information, or why Branson agreed to cooperate with him. R.411, PageID#24459-60,24462,24464.

After the interview, York wrote a police report falsely stating that Branson claimed that Amanda confessed to Branson that Amanda committed the Mills murder with her former-boyfriend, Joe King. R.411, PageID#24470-71. None of that was true. Whitehead killed Mills. Amanda is innocent, she never said King committed the crime, and she never confessed to anyone – and certainly not to this temporary cellmate she barely knew. R.417, PageID#26139,26141-42.

Branson did not corroborate York's claims, disavowing all memory of any of it. R.411, PageID#24477-78. Not even York claims that Joe King really was the murderer, as Amanda's alleged confession to Branson supposedly suggested. R.411, PageID #24476-77.

### York Pressures King
### to Pressure Amanda to Pressure Lester

To increase pressure on Amanda to cooperate against Lester, York approached her former boyfriend, Joe King. York told King that Branson said that Amanda said that King committed the murder. R.411, PageID#24486-87. York tried to get King to implicate Amanda. *Id.*, PageID#24473-74. King refused, disavowing (truthfully) any knowledge of the crime. R.365-1, King Trial Designation, pages 31,41-42.

York nonetheless wrote a police report falsely claiming that King implicated Amanda in the murder. R.411, PageID#24473-74. That was a lie. King did no such thing. R.365-1, pages 22-29; R.411, PageID#24578,24713,24733.

### York Pressures Jonathan
### to Pressure Amanda to Pressure Lester

Following the same playbook, York also went after Amanda's cousin, Jonathan, to try to turn him against her. To that end, Jonathan was arrested on unrelated bogus charges, which were later dropped. R.413, PageID#25073-74.

The police report from Jonathan's interrogation has disappeared. R.414, PageID#25322-23; R.418, PageID#26634-35. There is no legitimate explanation. In a capital murder case, York has not produced the police report documenting his interrogation of the person eventually charged with the murder. *Id.*[3]

---

[3] York claimed he did not create a report because Jonathan refused to talk. R.418, PageID 26634. Leaving aside the inadequacy of that explanation, it was untrue. Sheriff

Jonathan has learning disabilities and thinks slowly. R.413, PageID#25050-55.

But Jonathan knows this: he had nothing to do with Mills' murder, and has no

knowledge that Amanda, Lester, or anyone else was involved. *Id.*, PageID#25064-65.

He never wavered no matter how times York insisted otherwise. *Id.*

### York Pressures Kayla to Pressure Jonathan to Pressure Amanda to Pressure Lester

To leverage Jonathan, York approached Jonathan's former girlfriend,

17-year-old Kayla Mills. York initially interviewed Kayla in the presence of Sheriff

John Pickard. According to Pickard, Kayla was cooperative. She told them what she

knew about the crime, which was absolutely nothing. R.414, PageID#25323-24.

According to Pickard, there really was no reason to believe otherwise. *Id.*

Kayla's mother, a nurse, testified that York kept coming back to their home

over and over, harassing her daughter. York kept insisting that he had already solved

the crime and that Jonathan had confessed. R.418, PageID#26367. Kayla's mother

witnessed York pressuring Kayla to confirm that Jonathan and Amanda were

involved. *Id.*, PageID#26355,26366-68,26372. Kayla was unable to do so, and tried to

explain that to York, who would not accept it. *Id.*

---

Pickard, who was present for the interrogation, testified that Jonathan answered every question put to him, and denied all involvement. R.414, PageID#25321-23.

## The Investigation Goes Cold

York's investigation went cold. The Whitehead fingerprint match was still years away, and York was unable to solve the crime.

York contended he felt no pressure to close the case. R.411, PageID#24417-19, 24. During a taped interrogation, however, York admits that the victim's family was calling twice a day, and he had to do something. *Id.* At a minimum, York had devoted much time to this investigation with nothing to show for it. *Id.*

## March 2012

Fourteen months after the murder, York apparently decided it was time to charge someone. Everything came to a head in March 2012.

York first went back to Helton. In the intervening 14 months, York had conducted a series of interviews with Helton, none of which were documented. R.418, PageID#26606-07;26614-15. On March 7, 2012, Helton was arrested at his home, whereupon he was interrogated by York in the presence of Sheriff Pickard. R.417, PageID#26267-68. York told Helton he would face criminal charges unless he told York that Lester, Amanda and Jonathan were involved in the Mills murder. *Id.*, PageID#26268.

Helton had no knowledge of the crime or who committed it. At York's behest, he nonetheless agreed to tell a tale about a time he was pumping gas when Amanda (who he was not friends with) and Lester approached him to try to get him to make

some money robbing Mills with them. R.417, PageID#26270-71.

None of that was true. It was all made up by York for Helton to repeat. *Id.*

Helton is not the only one who testified that York fabricated Helton's statement. John Pickard, the elected Sheriff of Knox County, was present for the interview, including the conversation before York turned on the tape. R.414, PageID#25329. Pickard testified at the civil trial that it appeared to him like York was feeding Helton the information, not the other way around. *Id.* When Helton gave the statement implicating Plaintiffs, Pickard did not believe a word of it. *Id.,* PageID#25359.

Moreover, if Helton really had genuine knowledge that Plaintiffs were involved, York could not explain why Helton would not have revealed that a year earlier when first arrested after leaving town with Simpson shortly after the murder. Helton had just failed a polygraph about the murder, and was being accused of involvement. If he truly had evidence implicating the Plaintiffs (who he was not friends, and had no incentive to protect, R.417, PageID#26235), there is no good reason to have withheld it then.

York also misrepresented the circumstances of Helton's cooperation. York states on the interview tape: "you're not under arrest here" and suggested Helton was just coming forward to do a good deed. P's Trial Ex. 80, 3/15/22 Helton Audio :50-:57, 10:15, PageID#26285. That was completely untrue. *Id.* Helton was in the station after having been arrested. R.417, PageID#26268. Apparently concerned about the

14

misrepresentation, Sheriff Pickard wrote a letter to the prosecutor stating that Helton had been under arrest, and was offered assistance with his cases. R.414, PageID#25359. Pending charges against Helton were dismissed after he gave his statement. R.417, PageID#26278.

John Whitehead committed the crime. R.416, PageID#25921-23. That means Helton's story about Plaintiffs was a lie, and Helton, who had no personal knowledge of the crime details, could not have provided them without assistance from York.

### Amber Simpson

York next went to Amber Simpson, a 17-year-old opiate addict from the most opiate-addicted family in the County. R.411, PageID#24526.

When she was 15 or 16, Amber was Jonathan's neighbor in her apartment complex. R.413, PageID#24996-98. By trial, she had not spoken to Jonathan in a decade. *Id*. Amber knew nothing about Mills' murder, and never spoke to Jonathan (or anyone else) about it. *Id.* Jonathan certainly never confessed to her. *Id.* She had no genuine knowledge about any of it. *Id.*

When she was 17, York came to Amber's school and told her he had to talk to her about Jonathan and the Mills murder. R.413, PageID#24997-99. She had not asked to speak to him. *Id*. As with the others, there is no documented explanation for why York was approaching Amber, or why he had reason to believe she might have valid information about the crime. R.411, PageID#24524.

At Amber's school, York told Amber that he had been trying to get Jonathan for years, and threatened to charge her as an accomplice to murder. R.413, PageID#25002. He offered her a $10,000 cash reward plus help for her brother's criminal charges. *Id.* In her words, York was trying to "threaten me or pay me into saying some–saying some things he needed me to say to solve his case." *Id.*

Amber told York she did not know anything, but he would not accept that. R.413, PageID#25003-25009. He kept threatening to charge her with the crime. *Id.*, PageID#250009. Very scared, she felt forced and relented. *Id.*[4]

Simpson's memory of Jonathan's purported confession was an uncanny match for York's understanding of the crime. A year or more after-the-fact, Amber somehow recalled Jonathan's confession including placing precisely five $100 bills (the correct number) on the ground; the color (blue) of the getaway car; the victim was struck twice in the head; and Lester (who Amber had never met and did not know) planning the murder. *Id.,* PageID#25007-25009.

All of the information came from York. York told Amber what to say, and she did. *Id.,* PageID#25009. Amber could not have come up with any of it without York's

---

[4] At trial, York's entire case-in-chief consisted of a single witness, Rhonda Abner, the guidance counselor listed on York's report as being present for Amber's interview some 12 years earlier. After meeting with defense counsel three separate times to prepare for trial, Abner disavowed her earlier statements to investigators that York had discussed a reward with Amber and help for her brother. R.414, PageID#25530, 25542.

assistance. *Id.* None of it was true. Whitehead committed the crime. R.416, PageID#25921-25923.

## York's Dueling Murder Warrants

Armed with Helton, Branson, and Amber's statements, York sought and obtained murder warrants for Lester, Jonathan, Amanda and Kayla. R.411, PageID#24540-41.

Amanda *and* Kayla. To be clear, York has never claimed there were *two women* involved. Not one of the supposed confession scenarios claimed there were. York thus secured the murder warrants against Amanda and Kayla *in the alternative.*

In serving Amanda with her murder warrant, York offered her one more chance to save herself by implicating Lester. R.417, PageID#26149-50. Amanda refused, because she could not truthfully do so. *Id*.

York then went to Kayla and served her with her own murder warrant, telling her she was going to prison on a million-dollar bond unless she told him Plaintiffs had confessed. R.418, PageID#26656-57. York played Kayla his taped statement of Amber implicating Jonathan. *Id.*, PageID#26368. Kayla's mother witnessed York pressuring her to confirm that Plaintiffs were involved. *Id.*, PageID#26372.

Facing the threat of a murder warrant, Kayla broke down and agreed to say Jonathan had confessed to her. R.411, PageID#24508-10. To be fair, the alleged confession was sketchy; the best Kayla could do was that Jonathan supposedly once

remarked that he "left one on the creek." *Id.*, PageID#24509-10.

After Kayla agreed to implicate Jonathan, York made Kayla's murder warrant disappear. *Id.*, PageID#24600-01. When the case file was transmitted from the KSP to the Commonwealth, it was missing Kayla's murder warrant. *Id.*, PageID#24662. This warrant is still presently in the original KSP file, so someone had to affirmatively remove it before transmitting the file copy to the prosecutor. R.411, PageID#24542.

Jackie Steele, who prosecuted Plaintiffs, never knew about the Kayla murder warrant. R.411, PageID#24660-61. The judge, too, was in the dark. Instead, York presented Kayla as disinterested. R.411, PageID#14541-42. Until civil discovery, Plaintiffs and their lawyers thus never learned that Kayla – who killed herself before the charges were dropped – had been coerced by York to bear false witness due to the murder warrant against her. R.411, PageID#24660; R.418, PageID#26329.

### Crump Identification 2.0

With his investigation now settled in on Jonathan, York went back at the supposed eyewitness (Crump) to identify Jonathan. Recall that before Plaintiffs were his suspects, York previously drafted three separate sworn warrant affidavits stating that Crump had identified *Simpson* as the man he saw during his commute that morning. *Supra* at 7-8. At trial, York explained that as a "poor choice of words." R.418, PageID#26590.

Leaving aside that humans cannot truly recall innocuous and non-memorable people who they drove past long ago, and leaving aside that Crump was clear that he never claimed to see anyone's face, York sent Crump photos of Jonathan wearing a hoodie, trying to get Crump to sign them. R.200-2, PageID#9103, 9106. This was not a lineup. York only sent photos of Jonathan, and no one else. *Id.*

Crump refused to sign them. *Id.*, PageID#6431-32. However, despite Crump not seeing a face (during what would have been a totally non-memorable drive-by) York did get Crump to sign a sketch of a man resembling Jonathan wearing a hoodie. R.414, PageID#25482.

Jonathan has a blue tattoo. R.413, PageID#25135. There is a supplemental police report in the file stating that Crump recalled that the man he randomly drove past that day had a blue tattoo. R.417, PageID#26157. Contrary to protocol, however, this supplemental report is not only a different form and format from the other reports, but it is inexplicably *un-dated,* making it impossible to know when Crump recalled this tattoo-memory. *Id.*, PageID#26159. Though it was undated, Det. Cornett testified that the Crump tattoo police report was created in March of 2013, more than two years after the murder. *Id.*, PageID#26159.

Jonathan's criminal defense attorney asked to review the recording of York's interview with Crump to see if tattoos were really mentioned. R.414, PageID#25387. York, however, reported that the Crump tape was missing. The Crump tape has never

been located. R.411, PageID#24552. Its disappearance remains unexplained, last seen with York. R.417, PageID#26158.

At the civil trial, Crump testified that he saw one and only one person, a man, at that particular property that morning some 13 years earlier, and that he never saw a face. R.414, PageID#25480-81; 25484. He was unambiguous. *Id*. The police report describes one person, a man. P's Trial Ex. 17, Supp. Report, PageID#25494.

On cross-examination, however, York's attorney somehow managed to elicit from Crump that he now also remembered seeing a woman with sandy brown hair – like Amanda. R.414, PageID#25483, 25485. Det. Cornett was certain that Crump had never contemporaneously mentioned any female being present, which is why that is not in the original report. R.417, PageID#26166.

### York Secures Indictments

On April 27, 2012, York went before the grand jury to obtain indictments against Amanda, Jonathan and Lester. R.200-2, PageID#9123. He told the truth about nothing. He lied about everything. Examples of York's lies included the following, each of which York knew to be false: (1) both Plaintiffs knew Katherine Mills before her death (R.200-67, GJ Tr., PageID#11184); (2) William Lester went on the run when charged (*Id.,* PageID#11186); (3) Hoskins told York that she was at the doctor at 9:30 but did not arrive until noon (*Id.,* PageID#11199) and Hoskins was engaged in an affair with the doctor who provided the alibi (*Id.*); (4) Helton failed the polygraph on

grounds other than whether he killed the victim (*Id.,* PageID#11202); (5) Taylor and Kayla Mills were dating at the time of the murder, and Kayla's parents attempted to hide Kayla's blue car (*Id.,* PageID#11211); (6) Hoskins drove a blue car, like the one Crump supposedly recalled (*Id.*); and Crump allegedly identified Jonathan. (*Id.*)

### Daniel Wilson

In July 2012, after Plaintiffs were indicted, York found another jailhouse witness, Daniel Wilson, who briefly shared a cell with Jonathan. R.274-3, Wilson Designation, PageID#19474-75. Wilson was battling drug addiction, and facing six years for stealing a cellphone from Walmart. *Id.,* PageID#19479, 19515-16.

According to Wilson, one day he received an unsolicited visit from York, who asked him about former-cellmate Jonathan and the Mills murder. *Id.*, PageID#19476-77. York also mentioned Amanda, who he did not know. *Id.*, PageID#19483.

Wilson had not told anyone he had any information about the Mills case, which he did not. *Id.*, PageID#19477. Wilson and Jonathan never discussed the murder, and Jonathan never confessed to him. *Id.*, PageID#19475-76.

York offered to help Wilson on his case by talking to the judge. *Id.*, PageID#19498-19500. After the meeting, York wrote a report stating that Wilson supposedly confirmed that Jonathan confessed to killing "the lady" with his cousin, Amanda. *Id.*, PageID#19482-84.

This was false. Wilson did not tell this to York. *Id.* Wilson knew nothing about the case, and Jonathan had never confessed. *Id.*, PageID#19475-76; 19538.

Before the criminal trial, the prosecutor pulled Wilson from jail to talk to him. *Id.*, PageID#19485. Wilson told the prosecutor that what York was claiming was not true. *Id.*, PageID#19510.

## More Jailhouse Snitches: Robert Beach

By 2014, Plaintiffs had been in jail for two years, but there was no evidence or witnesses implicating them. In February 2014, York approached another inmate, Robert Beach, who had once been incarcerated with Jonathan. There is no police report, but York came away with a three-minute audiotape on which Beach says that Jonathan confessed to him. R.411, PageID#24562.

However, Beach was later caught on a recorded phone line telling his sister that the police had come to the jail asking if anyone remembered Jonathan and wanted to make a deal. P's Trial Ex. 137a, Beach audio, PageID#24558. Beach also admitted on the recorded call that he really had no genuine knowledge of anything. *Id*.

York testified that he just showed up at the jail with the Prosecutor (Steele) and listened to what Beach had to say. R.411, PageID#24561-62. Steele contradicted him, admitting that York had an undocumented pre-visit with Beach on an earlier date for which there also is no report. R.411, PageID#24663-64.

**Mikey Bruner**

When Beach's testimony became unusable after the recorded phone call admitting he knew nothing, York tried one more time. He met with Mikey Bruner in 2015, now four years after the fact. R.411, PageID#24586. It turned out that Bruner (another addict who was always in trouble) is York's family friend's son who York has known his whole life. *Id,* PageID#24586-88. Bruner did not know Jonathan but, according to York, claimed to have met him once, at which time Jonathan supposedly confessed to him. P's Ex. 1 at 52, Inv. File, York 3/22/22 Test., PageID#24586.

Bruner has never testified that any of this is true. York did not call him at trial.

**Plaintiffs' Alibis**

A sizeable disproportion of the police reports in York's investigation file (and presumably his Appellee brief) memorialize his extensive attempts to disprove Plaintiffs' alibis. Other than Plaintiffs, no other witnesses' alibis are documented.

Accounting for their whereabouts was made harder for Plaintiffs because they were not accused until long after the fact, and the day of the murder had not been a memorable day for them. At trial, Amanda was cross-examined at great length about where she went after a doctor's appointment at noon. R.417, PageID#26081-85. It turned out the crime was in the morning. R.418, PageID#26515.

## Deprivation of Liberty

Amanda spent five years in jail away from her children, who were three and seven when she was arrested. R.416, PageID#25980. Jonathan spent five years in maximum security, a place filled with violent people and danger. Unable to get medical attention for a pending condition, he now must defecate via a colostomy bag for the rest of his life. R.413, PageID#25098.

## Problems with the Prosecution

Steele was unaware of any deals with the witnesses because York told him there were none. R.411, PageID#24649-50, 24730. The Commonwealth's written discovery response in the criminal case stated that there were none. *Id.*

York, however, admitted at the civil trial that he made deals with, at a minimum, each of Kayla, Helton, Beach, Amber, and possibly jailhouse snitch Branson (for whom York could not recall either way[5]). R.418, PageID#26550-26553; R.411, PageID#24464. It was York's responsibility to tell Steele about these deals, but he did not. R.411, PageID#24730.

Steele turned over all documents he received from York. *Id.*, PageID#24629; 24637-38, 43. Jonathan's defense attorney received the Helton polygraph report, but without the page showing that Helton had failed the test. R.414, PageID#25385-86.

[5] Other jailhouse witnesses like Wilson were also presumably not cooperating for nothing. R.411, Page ID#24452 (York: "[A]nytime you're dealing with criminals. . . they always want help. That's how the world works.").

## The Case Collapses

By Summer 2016, the Whitehead match was still a year away, but the case against Plaintiffs was collapsing for lack of proof. In December 2012, the fingerprint on the bill excluded Plaintiffs and Lester. R.418, PageID#26454; 26531. The investigators swabbed under the victim's fingernails and found DNA, suggestive of a struggle, but in 2013, Plaintiffs and Lester were eliminated. *Id.*, PageID#26532.

The case was scheduled for trial on multiple dates. Plaintiffs' criminal defense attorney would prepare for trial and show up, only to be met with requests for continuances. R.417, PageID#26018. On one occasion, the prosecution asked for a continuance because York told Steele that Helton was "unavailable." York lied. In reality, Helton had told York that if they called him to testify, he would tell the truth. R.417, PageID#26296-98. To cover that up, York wrote a police report stating that Helton was in the hospital. P's Trial Ex. 1 at 54, Supp. Reports, PageID#26297-98.

Eventually, the case against Plaintiffs completely fell apart. There was no evidence. There were no witnesses implicating Plaintiffs. R.411, PageID#24680, 24683-84. All of the supposed confessions were fabricated.

Steele came to believe he had an ethical duty to file motions to dismiss the prosecutions. R.411, PageID#24683. In 2016, Steele faxed over dismissal of the murder charges to Plaintiffs' criminal defense counsel without communicating any reasons, which was unheard of. R.414, PageID#25399-25400.

### The Whitehead Fingerprint Match Report Is Withheld

In 2017, Plaintiffs filed this lawsuit against York and various other KSP detectives, alleging they had been framed. R.1. In civil discovery, Plaintiffs requested the complete investigative file for the Mills homicide, including all forensic reports and related communications. R.356, PageID#22312-13. In response, KSP produced what was purported to be the entire Mills case file. *Id.*, PageID#22312.

The production, however, had one page missing: the report documenting the Whitehead match. *Id.* PageID#22315. Plaintiffs received every page of the Mills file except the one showing that someone other than themselves committed the crime.[6]

Plaintiffs proceeded to litigate the case for five full years without this missing report, and without knowing anything about Whitehead or his involvement – or that Defendants knew about it. Defendants took every deposition and then moved for summary judgment, which they partially won, arguing that Plaintiffs were in fact guilty (and thus that York had not fabricated the evidence suggesting otherwise) without ever disclosing the Whitehead report.

For five years, Defendants and the KSP also declined to take any steps to investigate Whitehead's involvement (which would have generated documents) much

---

[6] The file without the Whitehead report had been produced to Plaintiffs by both York and the KSP, pursuant to both a document request and a subpoena, that were responded to by both York and KSP's in-house counsel, seeking both the investigative file and forensic lab file. R.410, Pre-trial Conf. Tr., PageID#24318-21.

less bring him to justice. Knowing that Plaintiffs were unaware of the Whitehead development, Defendants instead litigated this case for five years by insisting at every turn that York had correctly identified Plaintiffs as the real culprits.

### Plaintiffs Discover The Whitehead Match

Shortly before trial in 2022, Plaintiffs' counsel interviewed a forensic scientist named Keith Dollinger, who mentioned the Whitehead report. R.356, PageID#22308. Plaintiffs immediately demanded an explanation, and were provided the report, along with documents showing that Dollinger (appreciating the significance to the investigation) had immediately informed York's Post by phone back on May 12, 2017, ten days before the Whitehead report was created and sent over. R.410, Pre-trial Conf. Tr., PageID#24329; R.356-3, Motion, Ex. 3 at PageID#22375.

Upon discovering this, Plaintiffs filed an emergency motion, seeking more time for discovery into Whitehead, and insisting on an explanation for why this report had never been produced with the rest of the file. R.356, PageID#22316. Counsel for KSP (Shawna Kincer) appeared before the court and represented that the Whitehead report had been "mis-filed." R.410, Pre-trial Conf. Tr., PageID#24323-24. ("[w]hen we went back and looked for it this weekend, it was not where it was supposed to be within the file…"). Counsel stated: "I just know that it was potentially an oversight and I swear to the Court that, you know, as an officer of the Court, it wasn't an intentional act." *Id.*

The Court declined to move the trial date, but permitted three hours of depositions on the Friday before trial commenced. *Id.*, PageID#24331.

## The Whitehead Report Was Not "Mis-Filed"

These depositions revealed that the Whitehead report had not been "mis-filed" after all. R.410, Pre-trial Conf. Tr., PageID#24323; R.412, PageID#24767-68, 24773. It was in the Mills file exactly where it belonged in 2017, serialized and in sequential order. *Id.* In fact, during discovery, Plaintiffs received all the file pages before and after this page. That means that someone had to have deliberately removed it before copying the file to send to the Plaintiffs, and then re-inserted it back into the file. *Id.*

When KSP Captain Catron learned (on the eve of trial) that Whitehead had never been investigated, Catron set out to investigate what happened. R.418, PageID#26424. Catron confirmed that the fingerprint report had not been mis-filed at all. *Id.*, PageID#26426-28. The pages were marked sequentially and chronologically. *Id.*, PageID#26427. According to Catron's investigation, the Whitehead report was "right where it was supposed to be" and had been there the whole time. *Id.*, PageID#26427-28. ("[n]o reason to believe it was anywhere other than where it was supposed to be").

## The Belated Whitehead Investigation

After Plaintiffs discovered the Whitehead report, the court asked KSP's counsel why there had been no investigative steps by KSP (and thus any documents) relative to

the fingerprint hit since 2017. R.410, PageID#24324-25. KSP's counsel told the court, "I know that they're actively working now and trying to figure out what they can about this particular person." *Id*.

Over the weekend before the trial began, KSP Detective Jacob Wilson went to interview Whitehead for the first time. R.412, PageID#24773. He located Whitehead in a rehab facility in Eastern Kentucky. *Id.,* PageID#24774. Wilson's resulting report states: "Whitehead could not provide an explanation on why his fingerprint would be on the money." *Id.*, PageID#24775; P's Trial Ex. 418, PageID#24774.

The Whitehead interview was ridiculous. Wilson denied that Whitehead was even a suspect. R.412, PageID#24781. Wilson did not even review the file prior to the interview, and the only names he asked Whitehead about were whether he knew Amanda, Jonathan or Lester (he did not). *Id.*, PageID#24776-77. Whitehead was not asked for, and did not provide, any alibi. *Id.*, PageID#24782.

Claiming he was seriously addicted to drugs at the time, Whitehead first said he did not recall the murder in Stinking Creek. *Id.* Later in the interview, however, he admitted that he did. *Id.* PageID#24783.

After the interview, Wilson concluded that Whitehead was being honest, and thus ruled him out as a suspect. R.412, PageID#24783-86. This was so even though Wilson never actually asked him if he committed the crime. According to Wilson, there is nothing further to look into, and KSP is "done looking into John Whitehead's

involvement." *Id.*, PageID#24783-86.[7]

## York Lies About Knowledge of Whitehead

On the first day of trial, York's counsel indicated that "Friday was the first time we or Defendant York ever saw a fingerprint report identifying this other person [Whitehead]." R.410, PageID#24313. The court asked: "Ever saw? And ever was aware?" to which York's counsel stated: "Ever aware or knew about it." *Id.* The Court then personally interrogated York asking if he had seen or heard anything about the Whitehead report, or and any knowledge. *Id.*, PageID#24315. York repeatedly said "No, sir." *Id.*

Subsequent discovery disproved this. For one thing, when the lab called the Post about a fingerprint match in a capital murder case, unsurprisingly, the investigator would have been notified. R.418, PageID#26437. Also, in June of 2017, one month after the Whitehead fingerprint hit, KSP Sgt. Caudill retired as the supervisor of the detectives over all of their investigations. *Id.* York replaced Caudill. *Id.*, PageID#26438. In that capacity, York supervised all of the investigations. *Id.*, PageID#26439-26441. That meant York, who had left the Post, was personally responsible for supervising the Mills investigation during this time period. *Id.*,

---

[7] Asked if KSP was actively trying to catch the perpetrator, Wilson testified that the case was already solved by the arrests of the Plaintiffs. R.412, PageID#2476417. The case remained closed even after the charges were dropped against Plaintiffs for lack of evidence. *Id.*, PageID#17-2024764-67.

PageID#26440-41.[8]

Supplemental police reports had been created after the Whitehead fingerprint match report stating (falsely) that there were no new leads or suspects. R.418, PageID#26458-59; P's Trial Ex. 415, Supp. Reports, PageID#26458. These supplements from 2018 and 2019 are in the file, signed by supervisors. *Id.*, PageID#26458-61. However, according to Catron, the supplement for 2017 (the year of the Whitehead match) showing who reviewed for new leads and suspects is inexplicably absent from the permanent file. *Id.*, PageID#26461-63. That is the only year that is missing. *Id.*

### The "Smoking Gun"

On the fourth day of trial, literally while in the middle of conducting Catron's direct examination, Plaintiffs' counsel received a response from a FOIA (Freedom of Information Act) officer with a "smoking gun" email showing York was investigating John Whitehead in 2018. R.418, PageID#26451-52. In December 2018, York sent an email about John Whitehead to another KSP detective Defendant (Kelly Farris) involved in the Mills investigation. *Id.*, PageID#26467-68.

---

[8] According to Catron's trial testimony, York told him he wanted to supervise all of the investigations other than Mills. R.418, PageID#26441 ("He didn't want to have to review it or anything like that."). Catron has no recollection of why. *Id.* York asked Catron to put this file, and no other file, in Catron's office so that York would be able to say he did not have access to the file and was not involved in the investigation. *Id.*, PageID#26455-57.

This email was responsive to Plaintiffs' discovery requests – both pretrial and court-ordered after the Whitehead report was discovered – and should have been produced by Defendants. It was not. When the court ordered emergency discovery into the Whitehead withholding, Plaintiffs' counsel had specifically asked KSP's counsel to look for emails. R.418, PageID#26468, 26482. Asked why no one did a search for "Whitehead" and "York", KSP lawyers had no good answer. *Id.,* PageID#26469-72.

At a sidebar, Plaintiffs' counsel apprised the Court that he had just been handed this FOIA response containing York's email about York investigating Whitehead in 2018. Troublingly, defense counsel knew about the email (despite not producing it) and advised the Court that York "has no independent recollection." *Id.*, PageID#26452-53.

## SUMMARY OF THE ARGUMENT

The district court erroneously refused to allow Plaintiffs to pursue their Section 1983 claim for fabrication of evidence. This Circuit, and others, recognizes a claim for fabrication of evidence that results in some deprivation of liberty, a claim not dependent on either a conviction or absence of probable cause. Plaintiffs should have been permitted to pursue this claim at trial, and it was error to refuse it.

The district court further erred in refusing to impose any consequences when Plaintiffs' counsel fortuitously discovered immediately before trial that a fingerprint match identifying the true perpetrator had been provided to the investigators years earlier. This evidence had been suppressed and withheld from Plaintiffs throughout the litigation. During discovery, every page of the investigation file was produced except the report showing this fingerprint match. Defendants proceeded to participate in dozens of depositions and moved for summary judgment on the theory that Plaintiffs supposedly went around confessing to everyone, all the while hiding evidence that someone else actually committed the crime.

The court not only refused to impose any consequences for this fundamental perversion of the discovery process, but then inappropriately instructed the jury that it could not consider this evidence when considering York's liability for Plaintiffs' remaining claims for unlawful pretrial detention and malicious prosecution. Compounding that error, the court also instructed the jury it could not draw an adverse

inference from the actual perpetrator's Fifth Amendment assertions on the stand, which is the exact opposite of what the law provides.

Finally, the court also erred in refusing to allow Plaintiffs to elicit from York the fact that he told the prosecutors and grand jury numerous egregious and material lies. This, too, was error requiring a new trial.

## ARGUMENT

### I. The District Court Erroneously Prevented Plaintiffs From Proceeding With Their Fabrication Count

#### A. Legal Review Is *De Novo*

Where summary judgment was improperly granted, legal conclusions are reviewed *de novo. McQueen v. Williams*, 177 F.3d 523, 527 (6th Cir. 1999).

#### B. The Record Here Amply Supported Plaintiffs' Section 1983 Fabrication Claim

It would be difficult to imagine a fact pattern with more proof that criminal charges were procured against the Plaintiffs based on fabricated evidence. *Supra* at 5-24. When the dust settled, York had fabricated statements from almost a dozen people. None of them mentioned Whitehead – who actually committed the crime – because Whitehead was not yet known to York.

Witnesses consistently testified about "pre-interviews" before York turned on the recorder where he would pressure them and tell them what others were saying. R.416, PageID#25951 (Hoskins); R.417, PageID#26268-71 (Helton); R.413,

PageID#25001-04 (Simpson); R.200-47, PageID#10862-64 (King). Even on the tapes, York is constantly feeding the facts to witnesses about the victim and the crime, telling them where, when and how it happened. R.200-32, Lawson Audio, 26:26-26:42, 29:50-30:27; R. 413, PageID#25009 (Simpson); R.417, PageID#26276-26278. York is also the one who brings up Jonathan and Amanda, not the other way around, and he asks people questions like whether they saw them with the money or the purse, or driving a blue car. R.200-32, Lawson Audio, 26:26-26:42, 29:50-30:27; R. 413, PageID#25008.[9]

Critically, false facts that York mistakenly believed to be true ended up in the fabricated statements. For example, Lawson originally told investigators that $15,000 was stolen. D's Trial Ex. 2.25, Lawson Audio 3:20, PageID#24594. It turned out, however, that Lawson was wrong. Only $12,280 was stolen. Pl. Trial Ex. 1, KSP Inv. File, p.12. Yet two of the "confessions" obtained by York somehow both independently incorporated *the same wrong amount that York mistakenly believed was taken:* both Branson and Helton's accounts of Plaintiffs' confessions tracked that wrong take. R.417, PageID#26285, Pl. Trial Ex. 80, Helton Audio, 3:33; R.200-45, Branson Report, PageID#10835. Meanwhile, Amber somehow recalled being told the

---

[9] For example, on the Helton tape, after Helton only implicated Amanda, York says: "Who told you, or have you heard, about Jonathan and Kayla being there… so Amanda never did talk about Jonathan and Kayla?" R.417, PageID#26285, Pl. Trial Ex. 80, Helton Audio, 10:51-11:45. Helton thus did not mention York's other suspects' names. York did. *Id.*

precise number of $100 bills that got left on the ground, and apparently just about everyone remembered being confessed to that the getaway car was blue (matching Crump's supposed recollection). R.200-50, Simpson Report, PageID#10959.

The confessions were all also inconsistent with each other. York was so focused on trying to create pressure on other witnesses that his statements indiscriminately incriminated whoever he was focused on that day. All of them implicate York's potential suspects, but none actually match each other.

For example, half of York's eight witnesses against Plaintiffs put Kayla as part of the plot, but the other half did not. A maximum of four of those confession-accounts can be true. Same with Lester. Four of the statements York took had Lester involved, and four did not. As far as who was the person who actually committed the physical murder, various statements blamed King, Michael Mills, Jonathan, or Kayla.

Analyzed carefully, almost every single confession story is demonstrably false. The Commonwealth ultimately prosecuted a theory that the crime was committed by Amanda, Lester, and Jonathan, with Jonathan committing the physical act. Critically, that was not the alleged account of Branson (had King as murderer); King (no Jonathan); Amber Simpson (included Kayla); Wilson (only Jonathan and Amanda); Beach (only Jonathan and Amanda); and Bruner (included Kayla).

The only three people who refused to (falsely) implicate York's other suspects? Amanda, Jonathan, and Lester. The three people who got charged? Amanda, Jonathan,

and Lester. Everyone else who played along and gave false testimony avoided prosecution. All they had to do was point the finger at someone else, anyone else, and they were all spared prosecution – even as other witnesses implicated them in the crime. The three people who insisted they could not point the finger at anyone else, and only those three people, got put on trial for capital murder, all on the basis of fabricated evidence.

### C. The District Court Erroneously Concluded That This Circuit Does Not Recognize A Fabrication Of Evidence Claim Independent Of Malicious Prosecution

Having been deprived of liberty as a result of York's alleged fabrication of evidence, Plaintiffs pled a Section 1983 claim for fabrication. R.1, PageID#1.

Judge Bunning originally denied Defendants' motion to dismiss Plaintiffs' fabrication claim. R.119, PageID#750. After the case was transferred to another judge, however, he reversed that decision, concluding on summary judgment that this Circuit does not recognize a fabrication claim independent of a probable-cause-based, malicious prosecution violation. R.256, PageID#18669 ("Because evidence fabrication is not itself a *per se* constitutional violation, an allegation of the same, on its own, does not give rise to a §1983 suit.").

That was error. As one district court recently summarized: "Consistently, courts at all levels of the federal judiciary" allow Section 1983 plaintiffs to bring distinct fabrication claims and malicious prosecution claims with different elements. *Clark v.*

*Abdallah,* No. 21-10001, 2023 WL 4852230, at *5-6 (E.D. Mich. July 28, 2023), citing *McDonough v. Smith,* 139 S. Ct. 2149 (2019) (Plaintiffs brought both fabrication of evidence and malicious prosecution claims, and the Supreme Court analyzed each issue separately, signaling that the two causes of action are distinct); *cf. Manuel v. Joliet,* – U.S. –, 137 S.Ct. 911, 915-16 (2017) (rejecting the argument that probable cause foreclosed a claim arising from 48 days of unlawful pretrial detention "based entirely on made-up evidence").

This Court's opinion several months ago in *Price v. Montgomery County,* 72 F.4th 711, 723-24 (6th Cir. 2023) eliminated any ambiguity. *Price* expressly acknowledged the existence of a claim for fabricating incriminating evidence – a claim independent of malicious prosecution, and which therefore does not require absence of probable cause. *Id.* at 723-24. *See also Webb v. United States,* 789 F.3d 647 (6th Cir. 2015) ("More importantly, even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect."); *Stemler v. City of Florence,* 126 F.3d 856, 872 (6th Cir. 1997) ("A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant."); *Mills v. Barnard,* 869 F.3d 473 (6th Cir. 2017) (same); *France v. Lucas,* 836 F.3d 612 (6th Cir. 2016) (same); *Mott v. Mayer,* 524 F. App'x 179 (6th Cir. 2013) (same).

A due process fabrication claim of the type alleged here has two elements: "one, that evidence was knowingly fabricated; and two, that it is reasonably likely that the fabricated evidence affected the jury's decision." *Price,* 72 F.4th at 723. Crucially, "[a]s to the latter element, the relevant jury 'decision' *includes when fabricated evidence prompts the state to empanel a grand jury." Id.* at 723. No conviction is required. *Id.* ("As Martin's testimony doubtlessly affected the decision to empanel a grand jury, Miller only needs to show that the evidence was fabricated."). The *Price* court described such a fabrication claim as follows: "Miller argues that, had a prosecutor known all the problems with the defendants' case against Miller, Kentucky would not have brought charges against him." *Id.*

That is precisely this case. As Judge Bunning correctly determined, Plaintiffs properly stated a stand-alone claim for fabrication where York's misconduct induced Plaintiffs' grand jury indictments. Even without a trial or conviction, fabrication claims exist where the alleged misconduct induced criminal charges that impugn the fairness of the process and result in deprivation of liberty. *Jackson v. City of Cleveland,* 925 F.3d 793, 820-22 (6th Cir. 2019) ("A reasonable jury could find that Stoiker's misconduct influenced the decision to bring charges against Plaintiffs").

This Court is hardly alone in recognizing this claim. Other appellate courts have likewise permitted plaintiffs to pursue due process claims predicated on the fabrication of evidence notwithstanding that plaintiffs were not tried or convicted. *E.g., Cole v.*

*Carson,* 802 F.3d 752 (5th Cir. 2015) (recognizing "a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person"); *Avery v. Milwaukee,* 847 F.3d 433, 439 (7th Cir. 2017) ("[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way."); *Weiland v. Palm Beach,* 792 F.3d 1313 (11th Cir. 2015.

In sum, summary judgment should not have been granted on Plaintiffs' fabrication count. The claim should be remanded for trial.

## II.    The Jury Instructions Erroneously Barred The Jury Not Only From Inferring Whitehead's Guilt, But From Even Considering It To Prove Plaintiffs' Claims

When asked if he killed Mills, Whitehead asserted his Fifth Amendment right against self-incrimination. R.416, PageID#25921-22. The law provides that jurors should have been permitted to draw an inference that a truthful answer would have incriminated him. The court instead instructed the jury the exact opposite. The court then compounded the error by barring the jury from considering Whitehead's guilt when deciding whether York's witness statements were real or fake for probable cause purposes. These errors were sufficiently egregious to justify a new trial.

### A. Legal Standard

"Because the correctness of jury instructions is a question of law, they are reviewed *de novo." Gibson v. City of Louisville*, 336 F.3d 511, 512 (6th Cir. 2003).

### B. The Court's Fifth Amendment Instruction Got The Law Exactly Backwards

It has long been black letter law that jurors in civil cases are permitted to draw adverse inferences when a witness asserts a privilege against self-incrimination. The Supreme Court expressly held exactly that dating back to *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976), and has never looked back. This is simply not an open question in the law. *Hoxie v. D.E.A.*, 419 F.3d 477, 483 (6th Cir. 2005).

The rationale makes sense. A witness cannot assert this privilege merely as a matter of convenience or because he would prefer to duck a question. There must be a good faith basis to believe that truthful answers could trigger criminal liability. *In re Flint Water Cases*, 53 F.4th 176, 203 (6th Cir. 2022).   Under any appropriate view of relevance, a witness' choice not to affirmatively deny something one would be expected to deny, out of a reasonable fear that the truth could trigger criminal penalties, is very probative. *Bilokumsky v. Tod,* 263 U.S. 149, 153-54 (1923) ("silence is often evidence of the most persuasive character").

At bottom, the Fifth Amendment privilege, like all evidentiary privileges, is in derogation of the search for the truth. As the party bearing the burden, Plaintiffs were effectively denied important testimony. This witness may well have had compelling

41

personal reasons to resist answering, but Plaintiffs – like any other litigants – are entitled to sworn answers to questions on which the case at least partially turns.

To compensate for this stalemate, and to prevent trials from grinding to a silent halt, the Supreme Court made plain that assertions of the Fifth Amendment privilege in civil cases (as opposed to criminal) give rise to a permissive inference that truthful answers would have been adverse to the interests of the person asserting it. As stated, this is well-settled law. *In re Flint Water Cases*, 53 F.4th at 208.

The district court inexplicably ignored this rule. It would have been bad enough if the court had simply not instructed the jury at all that it was permitted to draw a negative inference, but the court took a full step further in the wrong direction, telling the jury that it "should not make an adverse inference" against Whitehead for asserting this privilege. R.415, PageID#25779.

The court, in other words, *got the law precisely backwards.* The Supreme Court expressly commands that jurors *may* draw an adverse inference, and the trial court told jurors they *may not.* Not only was this error, but as explained below, it was sufficient to have affected the outcome of the trial.

### C. The Court Compounded The Error By Also Instructing Jurors They Were Not Allowed To Consider Whitehead's Guilt When Assessing The Legitimacy Of York's Witness Statements Implicating Plaintiffs

Over Plaintiffs' objections, the court expressly instructed the jurors mid-trial that they were not permitted to consider any later-discovered evidence, including the

evidence of Whitehead's guilt, when deciding whether York had probable cause. R.418, PageID#26489. Under the circumstances presented here, this was an error sufficiently fundamental to require a new trial.

Taking a step back, there are two possible universes. Either Whitehead committed the Mills murder, or he did not. If he did, then the Plaintiffs did not. There is no serious dispute that both could not be true. The only evidence ever implicating Plaintiffs was York's witness statements containing confession-scenarios, and for all their variations, not one statement ever included Whitehead in any respect. No one has ever suggested they committed it together. No one knew Whitehead, or ever mentioned him. He was a drifter who committed a crime of opportunity. He had nothing to do with anyone York ever spoke to.

If Whitehead committed the crime, then the descriptions of the crime in all of York's witness statements are all necessarily false. Plaintiffs and Lester did not do the deed if someone else did. On this fact pattern, these alternative scenarios cannot both be true. At most, only one can.

Moreover, because they contained information known only to the killer and law enforcement, York either procured genuine witness statements from people with authentic knowledge, or else the information was fed to witnesses by York. The witnesses uniformly claim the latter. Every witness disavowed independent knowledge of the crime; each claimed York told them what to say, then threatened or

bribed them into spitting back what he wanted to hear, regardless of the truth.

York disputed that. According to York, he merely followed the witnesses.

Juries are presumed to follow the Court's instructions. *United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011). If jurors obeyed, then they were forbidden from even considering Whitehead's guilt in deciding whether York had probable cause. That restriction fatally impeded fair consideration of the issues.

Specifically, probable cause turned on whether York was legitimately finding evidence tending to implicate Plaintiffs' guilt, or whether was instead himself manufacturing the very evidence he relied on. To be sure, if York was just listening to what witnesses were telling him, then probable cause existed. However, if York was pressuring and manipulating witnesses into supporting his theory of the case, and feeding them the facts with which to do it, then probable cause was lacking. Police officers cannot falsify their own probable cause and then hope to rely on it. *Halsey v. Pfeiffer,* 750 F.3d 273, 293 (3d Cir. 2014) ("no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence").

Plaintiffs of course have no quarrel with the general proposition that probable cause is properly assessed by what officers knew at the time, not on later-developed evidence. That truism is undoubtedly correct. But it does not necessarily compel the conclusion that information developed later is always and in all cases *per se* irrelevant to probable cause. This case perfectly illustrates why not.

44

Plaintiff also recognizes the lower court's reasonable concerns about potential jury confusion over whether the Whitehead evidence could *directly* be part of York's probable cause calculus. It could not be, because it was not known at the time, and jurors needed to understand that (and were in fact told that per the pattern probable cause instruction). But in further prohibiting any and all consideration whatsoever on probable cause, the court's additional instruction went miles too far. Even if the Whitehead print was not fairly a factor in balancing probable cause, the evidence was not thereby irrelevant to probable cause to the point it could not even be considered.

Quite the opposite, Whitehead's guilt most definitely did need to be considered for Plaintiffs to have a fair trial. Not *directly* part of the probable cause inquiry, but as part of the equally critical inquiry over whether York's evidence of probable cause was genuine or fabricated. If Whitehead is in fact guilty, and had jurors been permitted to consider that evidence for that purpose, jurors most certainly could have concluded by a preponderance of the evidence that York could not have legitimately obtained so many witness statements concocting very similar totally made-up scenarios. *Gregory v. City of Louisville,* 444 F.3d 725, 739 (6th Cir. 2006) (officers cannot fabricate probable cause).

This argument is not new. When the court indicated at trial its intention to instruct the jury thusly, Plaintiffs' counsel anticipated this exact problem, and repeatedly flagged it. R.416, PageID#25918; R.414, PageID#25508-25510. Each

time, counsel explained that if the jury was forbidden from considering evidence of Whitehead's guilt on probable cause, then Plaintiff was being improperly and unfairly deprived of their strongest piece of evidence to prove that York's probable cause evidence was all fake, and that probable cause was therefore lacking. *Id.*

The court nonetheless concluded that "somebody else did it" does not equate to "York fabricating." R.416, PageID#25919-20 ("It's that last jump that I think is too far."). But the court never actually explained why that was so, nor addressed Plaintiffs' argument. The "jump" is not even a jump. It follows directly. If Whitehead did the crime, then York's witnesses could not have all legitimately implicated his suspects (with corroborating details of the crime, no less) without York's help.

In less than a full page, the court's Rule 59 ruling on this issue side-stepped the point again, explaining that "fabricated witness statements do not necessarily satisfy all elements of a malicious prosecution claim." R.403, PageID#24268. That may be true, but does not address the problem, which is that the court eliminated Plaintiffs' main argument: if Whitehead committed the crime, then York's collection of detail-rich statements implicating Plaintiffs had to have been improperly procured in the manner alleged by the witnesses, and thus could not legitimately support probable cause. *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014).

*Ayers* is directly on point. The court there explained that exculpatory DNA evidence discovered years later was relevant to probable-cause based malicious

prosecution claim because it tended to show that plaintiff never confessed to the crime. and that officers instead fed witnesses details about the case as alleged. *Id.* That holding compels the result here too.

The trial court's other explanation (that its instructions permitted the jury to consider the evidence on issues "like good faith and intent," R.403, PageID#24268) also misses the point. Good faith and intent notwithstanding, the Court's instruction literally barred the jury from considering Whitehead's guilt when deciding whether York's witness statements were genuine for purposes of probable cause. That restriction was irrational, and cannot stand. Once the jury is properly allowed to consider Whitehead's guilt on the issue of whether York's witness statements were real or phony, the jury could well reach a different conclusion about whether probable cause genuinely existed. A new trial is necessary to cure the error.

### III. In Light Of York's Empty Chair Defense Regarding The Suppressed Whitehead Report, The Court Abused Its Discretion In Prohibiting Plaintiffs From Informing The Jury About The Full Extent Of The Withholding

#### A. York Was Permitted To Unfairly Blame The Empty Chair

It was undisputed that when the Kentucky State Police (KSP) produced the investigative file for the Mills murder to Plaintiffs in September 2017, the only page that was missing from the file was the Whitehead fingerprint report. Plaintiffs somehow received every page except that one.

As described above, Plaintiffs' counsel fortuitously learned of the Whitehead report on the eve of trial. In response to the demand for an explanation for why this report had never been produced with the rest of the file, counsel for the KSP represented as an officer of the court that the report had been "mis-filed."

The Court made clear that the trial date would not be extended, but it did permit three hours of depositions on the Friday before trial began. At his deposition and again at trial, Captain Catron contradicted KSP counsel, making clear that the report had not been mis-filed. The report had been exactly where it belonged the whole time. Instead, someone had to have pulled this page out of the file before producing the file to Plaintiffs.[10]

After learning in depositions that the supervisor was notified, Plaintiffs wanted to ask said supervisor how it was even possible that he/she could have not discussed the matter with York (who spent so many years talking to everyone in Stinking Creek). But each of the three deponents was curiously unable to identify the supervisor for that time period. *Supra* at 32-33.

Plaintiffs' counsel asked for additional depositions, but was denied. R.416, PageID#25818-25839.

---

[10] Prosecutor Jackie Steele complained of the same thing regarding the Kayla murder warrant. He testified that he received all of the other three warrants in the investigative file, but not Kayla's, which he did not learn of until shown it at the civil trial. Supra at 19.

This ruling and the surrounding circumstances unfairly prejudiced Plaintiffs from proving that York had notice of and suppressed the fingerprint match (which he denied). The significance of what happened cannot be understated. The Whitehead report issued prior to Defendants' discovery responses being served in 2017. At the time, although York had separate counsel, KSP's counsel represented some of the Defendants who were at the time still in the case. There is no dispute that the Whitehead report was not part of the file copy provided to Plaintiffs. And contrary to the representation to the Court, this report was not mis-filed. It was in the file exactly where it was supposed to be.

The case was litigated for years without anyone telling Plaintiffs about Whitehead. At every deposition, York persisted with the defense that Plaintiffs really were guilty. Defendants moved for summary judgment on that theory – all without disclosing the evidence that someone else committed the crime. This is an intolerable perversion of the discovery process. *See Grange Mut. Cas. Co. v. Mack,* 270 Fed.App'x 372, 378 (6th Cir. 2008) ("Our civil legal system hinges on voluntary discovery. Discovery abuses must be sanctioned, because without adequate sanctions, the procedures for discovery would be ineffectual.").

At trial, York mounted a classic empty chair defense. His counsel repeatedly maintained that the Whitehead report suppression was KSP's fault, not his. R.410, Pre-Trial Conf., PageID#24313-14. The court accepted that. Having decided the

responsibility was with KSP, the court refused to allow Plaintiff to put on evidence of what happened: "All I care about all along is York's fingerprints on that – no pun intended – on that report not being in the file you got in discovery. That's all I care about." R.414 at 301-02. The court thus rejected Plaintiffs' request to take judicial notice of the chronology of the discovery requests, showing that the file had been produced without the Whitehead report. *Id.* at 301 ("I'm focused only York and that file and whether he has some inferential blame. That's all I care about. So I'm not taking judical notice at all that stuff."). Plaintiffs next attempted to introduce their requests for production to show that the Whitehead report should have been produced, but that too was refused. *Id.* at 302 ("[York] didn't produce the file, right? KSP produced it, so no.").

Plaintiffs' counsel responded that the KSP was the real party in interest, obligated to indemnify. *Id.;* Ky. Rev. Stat. § 16.185. Counsel further asked to inform the jury of that indemnification obligation, that the KSP attempted to withhold this key document, and to cross-examine KSP witnesses on the KSP's apparent desire to insulate Whitehead from prosecution. *Id.*

The Court's refusal to permit the jury to learn any of this was reversible error. York was improperly permitted to escape blame by pointing at KSP's empty chair. The jury should have been informed that the party responsible for the verdict violated the rules and attempted to undermine the process.

## B. The Court Improperly Barred Evidence That KSP Is To This Day Actively Trying Not To Solve The Crime

After Plaintiffs learned of the Whitehead fingerprint match, KSP apparently felt some belated need to investigate. As described above, Detective Wilson went to interview Whitehead during the weekend before trial began. Wilson insisted Whitehead was not a suspect, and came away satisfied that no further investigation is justified. R.412 at 36-39.

The tape of the Whitehead interview shows that the KSP was literally trying to help Whitehead, rather than establish his guilt. R.412, PageID#24778-79. The court prevented Plaintiffs from pursuing this line of inquiry because "York's not in control of" it, and "KSP is not on trial here." *Id.* As a result, the Court threatened to shut the entire exam down. *Id.* As the Court explained: "So I've let you get into Whitehead some with a limited relevance area there. But now you're belaboring it..." According to the court, "this is a narrow part of the case. And you're trying to make it the whole case." *Id.*, PageID#24781.

This was 100% wrong. Whitehead's guilt and KSP's attempts to disprove it may perhaps be a small corner of the case from the perspective of the Defendant, who contends that Plaintiffs are guilty. To the Defendant, evidence of Whitehead's guilt and KSP's lack of interest in bringing him to justice is undoubtedly a sideshow. To Plaintiffs, however, this really is "the whole case." If Whitehead committed the crime, then how did York get everyone to implicate the innocent Plaintiffs, replete with facts

only the killer and York would know? The lack of any interest in exploring Whitehead's guilt is unjustified and unexplained.

When Defendant's counsel files his brief, perhaps they will apprise this Court whether further investigation has been undertaken, especially after he took the Fifth at trial. Plaintiffs suspect not. If Whitehead's guilt was established, then all of the evidence supporting probable cause for Plaintiffs' arrests was fabricated by York. No one on that side is in any hurry to prove that, justice for the Mills family be damned. Given the indemnification obligation, the jury should have had the full picture.

## IV.   The Court Erred In Barring Plaintiffs From Eliciting Evidence Of York's Numerous Lies To The Grand Jury

There is no dispute that York lied to the prosecutor at the grand jury at least a half-dozen times. *Supra* at 21-22 There is also no serious room for debate that York was aware that his lies were lies (and for the rest, it could be easily inferred).

For example, contrary to his statements, York knew he never developed any evidence that: Plaintiffs knew Mills; Lester went on the run; Hoskins was having an affair with the doctor from her alibi; Helton did not fail the relevant polygraph questions; Hoskins was driving a blue car (like the one supposedly seen by Crump) around the time of the murder; Kayla's parents attempted to hide a blue car; and that Crump supposedly identified Jonathan. *Id.* York was just making these things up.

Before and during trial, Plaintiffs sought permission to elicit these false statements. R.410, PageID#24310-11; R.417, PageID#26304-09; R.418,

52

PageID#26314-22. Plaintiffs argued that York's binge of lies under oath corroborated his bad faith, improper intent, lack of credibility, and knowledge that his supposed-evidence was deficient. *E.g., Unger v. Bergh*, 742 F. App'x 55, 68 (6th Cir. 2018) ("A jury may infer consciousness of guilt from evidence of lying or deception").

The court barred all references on grounds that *Rehberg v. Paulk,* 566 U.S. 356 (2012) provides absolute immunity from liability for perjurious testimony. This misses the point. Plaintiffs did not seek to hold York liable for a tort predicated on perjured testimony. Plaintiffs sought to introduce evidence probative of other issues on trial. Those are completely different things, and absolute immunity does not create some sort of evidentiary privilege. *Dennis v. Sparks,* 449 U.S. 24, 27-28 (1980) (absolute immunity did not bar evidence of misconduct used for other purposes).

At a minimum, Plaintiffs sought to impeach York based on prior sworn answers – with a limiting instruction, if necessary, and stripped of references to the grand jury backdrop. R.410 at 16-18; R.417 at 313-21; R.418 at 2-10. The court refused even that, explaining: "if the Court allowed usage of the testimony for any purpose contributory to the action against York, it would violate the testimonial immunity assured York." R.346 at 15. That makes no sense. By definition, impeachment can involve prior sworn testimony. At every trial, parties impeach defendants with prior testimony to help prove liability for other claims without triggering absolute immunity. There are pattern jury instructions on that.

After Plaintiffs' counsel pointed that out, the court again refused to reconsider, even as it all but conceded that its ruling was dubious: "That's my well-considered ruling, and it may be dead wrong, and maybe one day I will be told that. And if so, I'll learn from it, but that's going to be my ruling on that." R.418 at 9.

The court did get it wrong. *Marshall v. Randall,* 719 F.3d 113, 116 (2d Cir. 2013) (grand jury testimony properly admitted for impeachment without contravening *Rehberg).* And evidence of York's willingness to lie with abandon was sufficiently important to have changed the outcome in a close case.

## V. The Court Erroneously Excluded Critical Rule 404(b) Evidence That Could Have Changed The Trial Result

Threatening *witnesses* with prison is not a thing. R.413, Trial Tr., PageID# 24898-90, 24930-31. Threatening *suspects* is one thing, but if police give *innocent witnesses* the choice between being locked up in jail or implicating others, bad things will inevitably happen – particularly for "witnesses" who are not actually claiming to be witnesses, and are only suspected of possibly having knowledge.

It was bad enough that York gave witnesses benefits/deals that he failed to disclose (*e.g.,* multiple jailhouse snitches) and actively hid (*e.g.,* the disappearing Kayla warrant and the false statement on the Helton tape that he was "not under arrest," when he was). But York took things to a whole other level when he threatened potential witnesses with prison if they did not finger his suspects.

As described above, that was York's *modus operandi.* At a minimum, Lawson, Helton, Amber, Kayla and Amanda[11] all claimed to be treated this way. *See Supra* at 6,8-10,16-18.

York denied all of it. The jury was thus presented with conflicting versions about what happened.

Plaintiffs attempted to introduce key evidence that could have broken this tie. Specifically, York recorded a jarring interview with an alibi witness for a person charged with another murder investigated by York. R.200, Ex. 95, Fox Recording. York tried to suppress the tape, but its existence surfaced when his supervisor acknowledged and then produced it during a capital murder trial. R. 200, Ex. 91, 5/18/2016 Tr. at 38-39. Like this case, that murder prosecution fell apart too.

Pretrial and during trial, Plaintiffs proffered a clip from the interview. R.318 and R.347-2. On it, York is captured verbally and physically assaulting the witness into repeating a fabricated statement. When he explains that what York is requesting him to repeat is untrue, York threatens to send him to jail if he does not change his story. The tape is chilling. The vulnerable man is clearly befuddled and baffled, protesting that he did not see what York tells him to repeat, and asking York why he has to go to prison. R.200-95, Fox Recording at 2:09:47-2:10:21.

---

[11] In fairness, Amanda started as just a witness, only to become a suspect after she refused to finger Lester. And Kayla started as a witness, shifted to suspect, then returned to witness.

This evidence should have been permitted under Fed. Rule. Evid. 404(b). It demonstrates York's idiosyncratic tactics and overly aggressive behavior with witnesses. *United States v. Joseph,* 270 Fed.Appx. 399 (6th Cir. 2008).

Moreover, the abuse of discretion in excluding it was significant. In finding for the defense, the jury ultimately chose to credit York's accounts of these interviews over those of the witnesses. Indeed, it is almost too much to believe that a detective would threaten innocent people with prison unless they implicated his suspects. Had jurors heard this proof that York in fact does use exactly that tactic, the verdict may have been different.

## VI.   The Court Erred In Allowing The KSP To Intimidate Jurors

Every trial morning, five uniformed KSP officers arrived early and lined up by the courthouse metal detectors until every juror entered the building. All five then sat in the courtroom for every minute of trial. R.399, PageID#24090. During each break, they stood guard outside the jury room, such that every juror had to walk past them to enter and exit. *Id.*

The unmistakable impression was that Plaintiffs somehow presented a danger to juror safety. The tactic worked stunningly well. Barely one hour into deliberations, the jury sent a note asking for post-verdict escorts to their cars. R.394, PageID#23892.

Something went seriously awry if jurors had that kind of fear. Amanda was a 37-year-old mother of three. Jonathan was a physically and intellectually disabled man

with no history of violence. They presented no danger to anyone. The creation of the illusion otherwise was a dirty trick, and should not be allowed at a retrial. While barring officers from the courtroom may go too far, at a minimum, a uniformed KSP phalanx should not be permitted to again pretend as if they are necessary to tend to juror security at the courthouse metal detectors and juror room.

## Conclusion

This Court should reverse and remand for a new trial as described herein.

DATED: October 3, 2023

Respectfully submitted,

/s/ Jon Loevy

Jon Loevy*
Elliot Slosar
Amy Robinson Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900
*Counsel of Record

**CERTIFICATE OF COMPLIANCE UNDER FRAP 32(g)**

I, Jonathan Loevy, an attorney, hereby certify that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,990 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This brief complies with the typeface and type style requirements of FED. R. APP. P. 32(a)(5) and 32(a)(7) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point for the body and footnotes.

s/ Jon Loevy

**CERTIFICATE OF SERVICE**

I, Jon Loevy, an attorney, certify that I filed the foregoing Brief of Appellants Amanda Hoskins and Jonathan Taylor on October 3, 2023 via CM/ECF, thereby delivering it to counsel of record via CM/ECF.

s/ Jon Loevy

**ADDENDUM:**
**Designation of Relevant District Court Documents from**
**Case No. 6:17-cv-84**

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 1 | Complaint | 1-40 |
| 30 | Answer to Complaint by M. Broughton, City of Barbourville, KY | 168-174 |
| 31 | Answer to Complaint by Derek Eubanks, Knox County, John Pickard | 175-187 |
| 36 | Rule 12(b)(6) Motion to Dismiss by Jason Bunch, Dallas Eubanks, Jason York | 194-196 |
| 36-2 | Memorandum in Support of Rule 12(b)(6) Motion to Dismiss | 198-211 |
| 36-3 | Motion to Dismiss | 212-215 |
| 36-4 | Order, *Comm. of Ky v. Jonathan Taylor*, 12-CR-00070-001 | 216-219 |
| 37 | Plaintiff's Unopposed Motion to Preserve Evidence | 220-225 |
| 37-2 | Ex. 1, KSP Request | 228 |
| 37-3 | Ex. 2, Supp. Report | 229-230 |
| 37-4 | Ex. 3, Order Granting AFIS | 231-236 |
| 37-5 | Ex. 4, Order from Knox County | 237 |
| 37-6 | Ex. 5, Correspondence | 238-240 |
| 37-7 | Ex. 6, Correspondence | 241 |
| 39 | Rule 12(b)(6) Motion to Dismiss of Defendants Bryan Johnson, Mark Mefford, Kelley Farris, and Jacqualine Joseph | 244-246 |
| 39-1 | Memorandum in Support of Rule 12(b)(6) Motion to Dismiss | 247-265 |
| 39-2 | Motion to Dismiss | 266-269 |
| 39-3 | Order, *Comm. of Ky v. Jonathan Taylor*, 12-CR-00070-001 | 270-273 |
| 53 | Defendants' Pickard, Eubanks, and Knox County Response to Defendants Motion to Dismiss [Dkt. 39] | 323-335 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 54 | Defendant John Pickard, Derek Eubanks, and Knox County Response to Defendants' Motion to Dismiss | 344-356 |
| 55-1 | Plaintiff's Consolidated Response to Individual KSP Defendants' Motions to Dismiss | 368-432 |
| 60 | KSP Defendants' Joint Reply to Plaintiffs' Consolidated Response to Individual KSP Defendants' Motion to Dismiss | 526-540 |
| 72 | Amended Answer to Complaint by Knox County, Knox County Sheriff's Department, John Pickard and Derek Eubanks | 578-590 |
| 73 | Amended Answer to Complaint by City of Barbourville and Mike Broughton | 591-598 |
| 79 | Plaintiff's Notice of Supplemental Authority In Support of Memorandum in Opposition to Motions to Dismiss | 609-612 |
| 119 | Memorandum Opinion & Order | 750-797 |
| 128 | Defendant Jason York Answer to Complaint | 835-844 |
| 129 | Defendant Jason Bunch Answer to Complaint | 845-854 |
| 130 | Defendants Bryan Johnson, Mark Mefford, Kelley Farris, Jackie Joseph Pickrell, and Dallas Eubanks Answer to Complaint | 855-864 |
| 177 | Defendant City of Barbourville and Mike Broughton's Motion for Summary Judgment | 1780-1781 |
| 177-1 | Defendant City of Barbourville and Mike Broughton's Memorandum in Support of Motion for Summary Judgment | 1782-1822 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 178 | KSP Officers Farris, Dallas Eubanks, Johnson, & Mefford's Motion for Summary Judgment | 2119-2175 |
| 179 | Knox County & Pickard Motion for Summary Judgment | 4834-4835 |
| 179-1 | Memorandum of Law in Support of Motion for Summary Judgment | 4836-4883 |
| 180 | Defendants Jason York and Jason Bunch Motion for Summary Judgment | 5224-5225 |
| 180-23 | Memorandum in Support of Motion for Summary Judgment | 5390-5440 |
| 199 | Order regarding refiling of Summary Judgment Briefing | 8970-8971 |
| 200 | Exhibit List | 8972-8976 |
| 200-1 | Ex. 1 – Amanda Hoskins Deposition Transcript | 8977-9083 |
| 200-2 | Ex. 2 – Jason York Deposition Transcript | 9084-9223 |
| 200-3 | Ex. 3 – Confidential Hoskins' Medical Records | 9224-9225 |
| 200-4 | Ex. 4 – Jonathan Taylor Deposition Transcript, Part I | 9226-9321 |
| 200-5 | Ex. 5 – Jonathan Taylor Deposition Transcript, Part II | 9322-9350 |
| 200-6 | Ex. 6 – Motion to Dismiss, *Comm. v. Jonathan Taylor* | 9351-9355 |
| 200-7 | Ex. 7 – Motion to Dismiss, *Comm. v. Amanda Hoskins* | 9356-9360 |
| 200-8 | Ex. 8 – Jackie Steele Deposition Transcript | 9361-9456 |
| 200-9 | Ex. 9 – Evidence/Recovered Property Slip | 9457-9458 |
| 200-10 | Ex. 10 – AFIS Report | 9459-9461 |
| 200-11 | Ex. 11 – KSP Forensic Report | 9462-9464 |
| 200-12 | Ex. 12 – Jesse Lawson Deposition Transcript, Part I | 9465-9514 |
| 200-13 | Ex. 13 – John Pickard Deposition Transcript | 9515-9617 |
| 200-14 | Ex. 14 – Mike Broughton Deposition Transcript | 9618-9689 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 200-15 | Ex. 15 – Mark Mefford Deposition Transcript | 9690-9727 |
| 200-16 | Ex. 16 – Mark Mefford Written Discovery Responses | 9728-9747 |
| 200-17 | Ex. 17 – James Allen Helton Deposition Transcript | 9748-9838 |
| 200-18 | Ex. 18 – Jackie Joseph Deposition Transcript | 9839-9910 |
| 200-19 | Ex. 19 – Det. Mike Cornett Report | 9911-9912 |
| 200-20 | Ex. 20 – Michael Crump Deposition Transcript | 9913-9947 |
| 200-21 | Ex. 21 – Det. Mike Cornett Report | 9948-9950 |
| 200-22 | Ex. 22 – Mark Mefford Report | 9951-9952 |
| 200-23 | Ex. 23 – Michael Simpson Deposition Transcript | 9953-10028 |
| 200-24 | Ex. 24 – Rental Car Receipt | 10029-10035 |
| 200-25 | Ex. 25 – Photos | 10036-10037 |
| 200-26 | Ex. 26 – KSP Investigative File | 10038-10342 |
| 200-27 | Ex. 27 – Citation | 10343-10347 |
| 200-28 | Ex. 28 – James Allen Helton Waiver | 10348-10349 |
| 200-29 | Ex. 29 – Jesse Lawson Deposition Transcript, Part II | 10350-10417 |
| 200-30 | Ex. 30 – Jason York Supplement | 10418-10420 |
| 200-31 | Ex. 31 – Polygraph Report | 10421-10423 |
| 200-32 | Ex. 32 – Lawson Audio Recording (CONVENTIONALLY FILED) | 10424 |
| 200-33 | Ex. 33 – James Allen Helton Polygraph Results | 10425-10427 |
| 200-34 | Ex. 34 – Jesse Lawson Search Warrant Affidavit | 10428-10430 |
| 200-35 | Ex. 35 – Affidavit for Search Warrant | 10431-10433 |
| 200-36 | Ex. 36 – Jesse Lawson Informant Report | 10434-10436 |
| 200-37 | Ex. 37 – KSP Report | 10437-10439 |
| 200-38 | Ex. 38 – Amanda Hoskins Affidavit | 10440-10442 |
| 200-39 | Ex. 39 – *Comm. v. James Allen Helton*, Docket 11-T-00136 | 10443-10460 |
| 200-41 | Ex. 41 – James Allen Helton Report | 10462-10464 |
| 200-42 | Ex. 42 – Hoskins Confidential Medical Record | 10465-10466 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 200-43 | Ex. 43 – Lisa Evans Deposition Transcript | 10467-10831 |
| 200-44 | Ex. 44 – Hoskins Confidential Fabricated Medical Record | 10832-10833 |
| 200-45 | Ex. 45 – Christy Branson KSP Report | 10834-10835 |
| 200-46 | Ex. 46 – Christy Branson Deposition Transcript | 10836-10853 |
| 200-47 | Ex. 47 – Joe King Deposition Transcript | 10854-10911 |
| 200-48 | Ex. 48 – Joe King Report | 10912-10914 |
| 200-49 | Ex. 49 – Amber Simpson Deposition Transcript | 10915-10957 |
| 200-50 | Ex. 50 – Amber Simpson Report | 10958-10960 |
| 200-52 | Ex. 52 – Donna Mills Deposition Transcript | 10962-11033 |
| 200-53 | Ex. 53 – Kayla Mills Arrest Warrant | 11034-11036 |
| 200-55 | Ex. 55 – Report of Kayla Mills' Statement | 11038-11039 |
| 200-56 | Ex. 56 – Kayla Mills Criminal Complaint | 11040-11041 |
| 200-57 | Ex. 57 – Daniel Wilson Deposition Transcript | 11042-11074 |
| 200-58 | Ex. 58 – Daniel Wilson Report | 11075 |
| 200-59 | Ex. 59 – Mark Mefford Wilson Report | 11076-11077 |
| 200-60 | Ex. 60 – Michael Crump Sketch | 11078-11079 |
| 200-61 | Ex. 61 – Jonathan Taylor Photographs | 11080-11088 |
| 200-62 | Ex. 62 – Jason York Response to Pl. First Set of Interrogatories | 11089-11107 |
| 200-63 | Ex. 63 – Dr. Neushatz Report | 11108-11153 |
| 200-64 | Ex. 64 – Amanda Hoskins Charging Document | 11154-11156 |
| 200-65 | Ex. 65 – Jonathan Taylor Charging Documents | 11157-11159 |
| 200-66 | Ex. 66 – Preliminary Hearing Tr. | 11160-11179 |
| 200-67 | Ex. 67 – Jason York Grand Jury Tr. (Complete) | 11180-11230 |
| 200-70 | Ex. 70 – Bryan Johnson Deposition Transcript | 11233-11276 |
| 200-72 | Ex. 72 – Robert Beach Call Log | 11278-11281 |
| 200-74 | Ex. 74 – Mike Bruner Deposition Transcript | 11283-11386 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 200-75 | Ex. 75 – Mike Bruner Statement | 11387-11389 |
| 200-76 | Ex. 76 – Knox County Policies and Procedures | 11390-11426 |
| 200-77 | Ex. 77 – Michael Smith Deposition Transcript | 11427-11440 |
| 200-78 | Ex. 78 – Elliot Slosar Correspondence | 11441-11442 |
| 200-79 | Ex. 79 – Knox County Correspondence | 11443-11444 |
| 200-80 | Ex. 80 – Plaintiff's Notice of 30(B)(6) Depositions | 11445-11451 |
| 200-81 | Ex. 81 – Plaintiff Correspondence to Knox County | 11452-11453 |
| 200-82 | Ex. 82 – Knox County Correspondence Re: 30(B)(6) | 11454-11455 |
| 200-83 | Ex. 83 – Charles Drago Report | 11456-11508 |
| 200-84 | Ex. 84 – John Pickard Training History | 11509-11513 |
| 200-85 | Ex. 85 – William Anderson May 12, 2016 Trial Tr. | 11514-11785 |
| 200-86 | Ex. 86 – William Anderson May 16, 2016 Trial Tr. | 11786-11985 |
| 200-87 | Ex. 87 – William Anderson Police Reports | 11986-11999 |
| 200-88 | Ex. 88 – Otis Sizemore Guilty Plea | 12000-12004 |
| 200-89 | Ex. 89 – William Anderson May 19, 2016 Trial Tr. | 12005-12184 |
| 200-90 | Ex. 90 – William Anderson May 25, 2016 Trial Tr. | 12185-12295 |
| 200-91 | Ex. 91 – William Anderson May 18, 2016 Trial Tr. | 12296-12484 |
| 200-92 | Ex. 92 – William Anderson May 9, 2016 Trial. Tr. | 12485-12738 |
| 200-95 | Ex. 95 – December 3, 2011 David Fox Audio Recording (CONVENTIONALLY FILED) | 12741 |
| 200-97 | Ex. 97 – Plaintiffs' Rule 26(a)(1) Disclosures | 12743-12755 |
| 200-98 | Ex. 98 – York Crump Report | 12756-12757 |
| 200-99 | Ex. 99 – Cornett Supplement | 12758-12760 |
| 200-100 | Ex. 100 – March 14, 2014, Pickard Letter | 12761-12762 |
| 200-101 | Ex. 101 – Knox County Response to Plaintiffs' First Set of Interrogatories | 12763-12772 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 200-102 | Ex. 102 – PL Taylor Response to Barbourville Interrogatories | 12773-12794 |
| 200-103 | Ex. 103 – PL Hoskins Response to Barbourville Interrogatories | 12795-12816 |
| 200-104 | Ex. 104 – Kelly Farris Deposition Transcript | 12817-12900 |
| 200-105 | Ex. 105 – Dallas Eubanks Deposition Transcript | 12901-12979 |
| 200-106 | Ex. 106 – Derek Eubanks Deposition Transcript | 12980-13067 |
| 200-107 | Ex. 107 – William Lester Deposition Transcript | 13068-13481 |
| 200-108 | Ex. 108 – Jerry Wayne Smith Deposition Transcript | 13482-13613 |
| 200-109 | Ex. 109 – Josh Powell Deposition Transcript | 13614-13708 |
| 200-110 | Ex. 110 – Drago Deposition Transcript | 13709-14084 |
| 200-111 | Ex. 111 – KSP Policies and Procedures | 14085-14744 |
| 200-112 | Ex. 112 – May 2019 Investigative Files | 14745 |
| 200-114 | Ex. 114 – Notice of Intent to Seek Death Penalty | 14747-14749 |
| 200-115 | Ex. 115 – Jason Bunch Deposition Transcript | 14750 |
| 200-116 | Ex. 116 – June 30, 2016 Order | 14823-14825 |
| 200-117 | Ex. 117 – August 18, 2016 Order | 14826-14828 |
| 200-118 | Ex. 118 – Jonathan Taylor Response to CW Motion to Dismiss | 14829-14833 |
| 200-119 | Ex. 119 – Amanda Hoskins Response to CW Motion to Dismiss | 14834-14839 |
| 200-121 | Ex. 121 – Jason York training records | 14841-14915 |
| 200-127 | Ex. 127 – Cover Pages from Commonwealth Attorney's Discovery Disclosures [PL 026705] | 14921-14922 |
| 200-128 | Ex. 128 – Cover Pages from Commonwealth Attorney's Discovery Disclosures [PL 025296] | 14923-14924 |
| 200-129 | Ex. 129 – Cover Pages from Commonwealth Attorney's Discovery Disclosures [PL 0026964] | 14925-14926 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 200-130 | Ex. 130 – Medical Record for Amanda Hoskins from Hope Medical Center [PL 026756] | 14927 |
| 200-131 | Ex. 131 – Faxed Medical Record for Amanda Hoskins from Hope Medical Center [PL 026973] | 14928 |
| 201-1 | Motion for Summary Judgment & Supporting Memorandum by KSP Defendants | 14932-14988 |
| 204 | Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment | 14998-15227 |
| 205-1 | Joint Memorandum of Law in Support of Motion for Summary Judgment | 15233-15284 |
| 206-1 | Amended Memorandum of Law in Support of Motion for Summary Judgment | 15288-15335 |
| 207-1 | City of Barbourville and Broughton Memorandum in Support of Motion for Summary Judgment | 15339-15379 |
| 211 | KSP Defendants' Reply to Plaintiff's Summary Judgment Response | 15386-15403 |
| 213 | Defendant Mike Broughton and City of Barbourville's Reply in Support of Motion for Summary Judgment | 15410-15432 |
| 214 | Defendant Mike Broughton and City of Barbourville's Reply in Support of Motion to Exclude Dr. Neuschatz | 15433-15445 |
| 216 | Knox County Reply to Motion for Summary Judgment | 15683-15702 |
| 216-1 | Ex. 1 – Crime Supplement | 15703-15706 |
| 216-2 | Ex. 2 – Dep. of Derek Eubanks | 15707-15912 |
| 216-3 | Ex. 3 – Ethics Opinion | 15913-15915 |
| 218 | Plaintiff's Motion to Bar Certain Testimony of Expert Fryer | 15920-15928 |
| 218-1 | Ex. 1 – Deposition of Fryer | 15929-16204 |
| 218-2 | Ex. 2 – Expert Report | 16205-16222 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 219 | Plaintiff's Motion to Bar Certain Testimony of Expert Jack Ryan | 16224-16238 |
| 219-1 | Ex. 1 – Expert Report | 16239-16286 |
| 220 | Plaintiff's Motion to Bar Certain Testimony of Expert Carl Christensen | 16288-16307 |
| 220-1 | Ex. 1- Deposition of Christiansen | 16308-16590 |
| 220-2 | Ex. 2 – Expert Report | 16591-16600 |
| 227 | KSP Sgt. Jackie Joseph's Reply to Plaintiffs' | |
| 227-1 | Ex. 1 – Affidavit of Lt. Jacqualine R. Joseph | 16977-16992 |
| 228 | Defendant Jason York's Motion to Exclude Charles Drago | 16993-16998 |
| 228-1 | Ex. 1 – Expert Report | 16999-17050 |
| 232 | Defendant City of Barbourville's and Broughton's Response in Opposition to Plaintiffs' Motion to Bar Certain Testimony of William Dee Fryer | 17059-17074 |
| 233 | Response to Plaintiffs' Motion to Exclude Jack Ryan Testimony | 17075-17088 |
| 233-1 | Ex. 1 – Expert Qualifications | 17089-17108 |
| 233-2 | Ex. 2 – Plaintiff's Offer of Proof, *Hardy v. City of Milwaukee et al.*, Case No. 2:13-cv-769 | 17109-17112 |
| 233-3 | Ex. 3 – Expert Report | 17113-17160 |
| 233-4 | Ex. 4 – Deposition of Jack Ryan | 17161-17549 |
| 234 | Plaintiffs' Response in Opposition to Motion to Exclude Dr. Tekulve | 17550-17558 |
| 234-1 | Ex. 1 – Deposition Excerpts | 17559-17563 |
| 235 | Plaintiffs' Response to Defendants' Motion to Exclude Charles Drago | 17564-17580 |
| 235-1 | Ex. 1 – Expert Report | 17581-17632 |
| 235-2 | Ex. 2 – Donna Mills Dep. | 17633-17703 |
| 235-3 | Ex. 3 – Jason York Dep. | 17704-17842 |
| 235-4 | Ex. 4 – Expert Report | 17843-17854 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 236 | Plaintiffs' Response in Opposition to Defendants' Motion to Exclude Dr. Jeffrey Neuschatz | 17855-17865 |
| 236-1 | Ex. 1 – Expert Report | 17866-17910 |
| 236-2 | Ex. 2 – Jason York Dep. | 17911-18049 |
| 236-3 | Ex. 3 – Sketch | 18050 |
| 236-4 | Ex. 4 – Jonathan Taylor Dep. Vol. 1 | 18051-18145 |
| 236-5 | Ex. 5 – Jonathan Taylor Dep. Vol. 2 | 18146-18173 |
| 236-6 | Ex. 6 – Mike Broughton Dep. | 18174-18244 |
| 236-7 | Ex. 7 – Jason York's Answers to 1st Set of Interrogatories | 18245-18262 |
| 236-8 | Ex. 8 – Jackie Steel Dep. | 18263-18375 |
| 237 | Defendant Jason York's Response to Motion to Exclude Larry Daniel | 18376-18392 |
| 237-1 | Ex. 1 – Garrett Report | 18393-18428 |
| 237-2 | Ex. 2 – Garrett Deposition Excerpts | 18429-18434 |
| 237-3 | Ex. 3 – Garrett Rebuttal Report | 18435-18445 |
| 238 | Defendant Jason York's Response to Motion to Exclude Carl Christiansen | 18446-18451 |
| 239 | City of Barbourville Reply in Support of Motion to Exclude Dr. Neuschatz | 18452-18459 |
| 240 | Knox County Reply in Support of Motion to Exclude Dr. Tekulve | 18460-18466 |
| 241 | Plaintiffs' Reply in Support of Motion to Exclude Carl Christensen | 18467-18474 |
| 242 | Plaintiffs' Reply in Support of Motion to Exclude William Fryer | 18475-18483 |
| 243 | Plaintiffs' Reply in Support of Motion to Exclude Jack Ryan | 18484-18494 |
| 244 | Plaintiffs' Reply in Support of Motion to Exclude Larry Daniel | 18495-18500 |
| 244-1 | Ex. 1 – Expert Report | 15801-18547 |
| 244-2 | Ex. 2 – Expert Report | 18548-18583 |
| 244-3 | Ex. 3 – Expert Report | 18584-18594 |
| 245 | Jason York Reply in Support of Motion to Exclude Charles Drago | 18595-18606 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 256 | Opinion and Order re: Summary Judgment | 18669-18759 |
| 257 | Opinion and Order re: *Daubert* Motions | 18760-18775 |
| 273 | Plaintiffs' Proposed Jury Instructions | 19188-19232 |
| 274 | Plaintiffs' Witness List | 19233-19241 |
| 274-1 | Michael Crump Deposition Designations | 19424-19340 |
| 274-2 | Amber Simpson Deposition Designations | 19341-19463 |
| 274-3 | Daniel Wilson Deposition Designations | 19464-19555 |
| 274-4 | James Helton Deposition Designations | 19556-19838 |
| 275 | Plaintiffs' Exhibit List | 19839-19849 |
| 276 | Plaintiffs' Pretrial Report | 19850-19855 |
| 277 | Defendant Jason York's Proposed Jury Instructions | 19856-19858 |
| 277-1 | Jury Instructions | 19859-19875 |
| 277-2 | Special Interrogatories | 19876-19878 |
| 278 | Defendant Jason York Pretrial Report | 19879-19885 |
| 279 | Defendant Jason York Witness List | 19886-19893 |
| 280 | Defendant Jason York Exhibit List | 19894-19902 |
| 289 | Plaintiffs' Motion *in Limine* 1 | 19927-19930 |
| 289-1 | Ex. 1 – *Comm. v. Taylor*, Motion to Dismiss | 19931-19934 |
| 291 | Plaintiffs Motion *in Limine* 2 | 20060-20063 |
| 291-1 | Ex. 1 – Jackie Steel Excerpts | 20064-20066 |
| 291-2 | Ex. 2 – *Comm. v. Taylor*, Motion to Dismiss | 20067-20070 |
| 292 | Plaintiffs' Motion *in Limine* 3 | 20072-20073 |
| 293 | Plaintiffs' Motion *in Limine* 4 | 20075-20079 |
| 294 | Plaintiffs' Motion *in Limine* 5 | 20081-20085 |
| 294-1 | Ex. 1 – Supplement Report | 20086-20087 |
| 294-2 | Ex. 2 – Jason York Excerpts | 20088-20090 |
| 294-3 | Ex. 3 – Arrest Warrant | 20091 |
| 294-4 | Ex. 4 – Arrest Warrant | 20092 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 294-5 | Ex. 5 – *Comm. v. Taylor*, Motion to Dismiss | 20093-20096 |
| 296 | Plaintiffs' Motion *in Limine* 6 | 20716-20719 |
| 298 | Plaintiffs' Motion *in Limine* 7 | 20810-20815 |
| 298-1 | Ex. 1 – Search Warrant | 20816-20817 |
| 298-2 | Ex. 2 – Phone Records | 20818-20834 |
| 298-3 | Ex. 3 – Search Warrant | 20835-20836 |
| 298-4 | Ex. 4 – Phone Records | 20837-20843 |
| 298-5 | Ex. 5 – Search Warrant | 20844-20845 |
| 298-6 | Ex. 6 – Phone Records | 20846-20858 |
| 298-7 | Ex. 7 – Phone Records | 20859-20978 |
| 298-8 | Ex. 8 – Phone Records | 20979-21048 |
| 298-9 | Ex. 9 – Phone Records | 21049-21116 |
| 298-10 | Ex. 10 – Arrest Warrant | 21117 |
| 298-11 | Ex. 11 – Arrest Warrant | 21118 |
| 298-12 | Ex. 12 – *Comm. v. Taylor*, Motion to Dismiss | 21119-21122 |
| 299 | Plaintiffs' Motion *in Limine* 8 | 21124-21127 |
| 299-1 | Ex. 1 – Supplement Report | 21128 |
| 300 | Plaintiffs' Motion *in Limine* 9 | 21130-21132 |
| 301 | Plaintiffs' Motion *in Limine* 10 | 21135-21139 |
| 301-1 | Ex. 1 – Jason York Excerpts | 21140-21141 |
| 301-2 | Ex. 2 – Arrest Warrant | 21142 |
| 301-3 | Ex. 3 – Arrest Warrant | 21143 |
| 301-4 | Ex. 4 – *Comm. v. Taylor*, Motion to Dismiss | 21144-21147 |
| 302 | Plaintiffs' Motion *in Limine* 11 | 21149-21151 |
| 303 | Plaintiffs' Motion *in Limine* 12 | 21153-21160 |
| 303-1 | Ex. 1 – Amanda Hoskins Excerpts | 21175-21188 |
| 303-2 | Ex. 2 – Jonathan Taylor Dep. Vol. 1 | 21189-21283 |
| 303-3 | Ex. 3 – Jonathan Taylor Dep. Vol. 2 | 21284-21311 |
| 304 | Plaintiffs' Motion *in Limine* 13 | 21170-21174 |
| 305 | Plaintiffs' Motion *in Limine* 14 | 21313-21320 |
| 306 | Plaintiffs' Motion *in Limine* 15 | 21322-21338 |
| 306-1 | Ex. 1 – Amanda Hoskins Excerpts | 21339-21345 |
| 306-2 | Ex. 2 – Jonathan Taylor Excerpts | 21346-21351 |
| 306-3 | Ex. 3 – Rodney Elliot File | 21352-21370 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 306-4 | Ex. 4 – Criminal Record | 21371-21393 |
| 306-5 | Ex. 5 – Courtnet Record | 21394-21412 |
| 306-6 | Ex. 6 – Jason York Answers to Interrogatories | 21413-21430 |
| 307 | Plaintiffs' Motion *in Limine* 16 | 21432-21435 |
| 308 | Plaintiffs' Motion *in Limine* 17 | 21437-21441 |
| 309 | Plaintiffs' Motion *in Limine* 18 | 21464-21466 |
| 310 | Plaintiffs' Motion *in Limine* 19 | 21468-21470 |
| 311 | Plaintiffs' Motion *in Limine* 20 | 21472-21475 |
| 312 | Plaintiffs' Motion *in Limine* 21 | 21477-21479 |
| 313 | Plaintiffs' Motion *in Limine* 22 | 21481-21483 |
| 313-1 | Ex. 1 – Michael Crump Excerpts | 21484-21486 |
| 314 | Plaintiffs' Motion *in Limine* 23 | 21488-21492 |
| 314-1 | Ex. 1 – Donna Mills Excerpts | 21493-21496 |
| 315 | Plaintiffs' Objections to Defendant's Witness List | 21498-21507 |
| 315-1 | Ex. 1 – Shannon Cobb Bunch Dep. | 21508-21529 |
| 316-1 | Plaintiffs' Objections to Defendants Exhibit List | 21532-21537 |
| 318 | Plaintiffs ' Omnibus Reply to Defendant's Motions *in Limine* | 21553-21607 |
| 318-1 | Ex. 1 – Jason York Dep. Vol. 1 | 21608-21680 |
| 318-2 | Ex. 2 – Jason York Dep. Vol. 2 | 21681-21730 |
| 318-3 | Ex. 3 – Memorandum | 21731-21733 |
| 318-4 | Ex. 4 – Excerpts of Reuben York Dep. | 21734-21736 |
| 318-5 | Ex. 5 – Excerpts of Linda Taylor Dep. | 21737-21738 |
| 318-6 | Ex. 6 – Excerpts of Dr. Tekulve Dep. | 21739-21740 |
| 319 | Plaintiffs' Response to Defendant York's Objections to Witnesses Listed by Plaintiffs | 21741-21831 |
| 319-1 | Plaintiffs' Second Amended Rule 26(a)(1) Disclosures | 21832-21843 |
| 319-2 | Defendant Jason York 26(a)(1) Disclosures | 21844-21851 |
| 319-3 | Courtnet Results – Tasha Abner | 21852-21867 |
| 319-4 | April 30, 2013 Tasha Abner Memo | 21868-21869 |
| 319-5 | Lisa Evans Deposition Excerpts | 21870-21873 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 319-6 | July 29, 2015 Mikey Bruner Memo | 21875-21875 |
| 319-7 | Audio File of Else Abner | 21876 |
| 319-8 | Mike Bruner Dep. Excerpts | 21877-21887 |
| 319-9 | Josh Powell Dep. Excerpts | 21888-21893 |
| 319-10 | Memo re: Jack Davis Sr. | 21894-21895 |
| 319-11 | Memo re: Brandie Messer | 21896 |
| 319-12 | James Helton Dep. Excerpts | 21897-21912 |
| 321 | Plaintiffs' Response to Defendant York's Designations | 21915-21922 |
| 325-1 | Defendant Jason York's Consolidated Response to Plaintiffs' Motions in Limine Nos. 1-23 | 21940-21976 |
| 325-2 | Ex. A – Allen Helton Interview | 21977-22020 |
| 325-3 | Ex. B – Privilege Log | 22021 |
| 325-4 | Ex. C – Privilege Log | 22022-22031 |
| 325-5 | Ex. D – Memo re: Michael Crump | 22032-22035 |
| 346 | Order re: Motions in Limine | 22166-22185 |
| 347 | Motion for Leave to Amend Pursuant to Dkt. 344 | 22186-22188 |
| 347-1 | Ex. 1 – Plaintiffs' Revised Exhibit List | 22189-22200 |
| 347-2 | Ex. 2 – Plaintiffs' Motion to Reconsider Rulings on Motions in Limine No. 4 and No. 1 | 22201-22213 |
| 347-3 | Ex. 3 – Plaintiffs' Motion to Reconsider Motion in Limine No. 13 Ruling | 22214-22217 |
| 347-4 | Ex. 4 – A. Hoskins Dep. Excerpts | 22218-22228 |
| 351 | Defendant's Response to Plaintiffs' Motion for Leave to Amend | 22239-22253 |
| 351-1 | Ex. 1 – Correspondence | 22254 |
| 351-2 | Ex. 2 – Correspondence | 22255 |
| 352 | Plaintiffs' Reply in Support of Their Motion for Leave to Amend | 22257-22268 |
| 352-1 | Ex. 1 – Correspondence | 22269-22287 |
| 356 | Plaintiffs' Motion for Emergency Relief | 22308-22319 |
| 356-1 | Ex. 1 – Grand Jury Excerpt | 22320-22333 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 356-2 | Ex. 2 – Supplementary Report | 22334-22372 |
| 356-3 | Ex. 3 – Supplementary Report | 22373-22381 |
| 356-4 | Ex. 4 – Plaintiffs' First Set of Requests for Production to Individual KSP Defendants | 22382-22393 |
| 359 | Defendant's Response to Plaintiffs' Motion for Emergency Relief | 22405-22410 |
| 359-1 | Ex. 1 – Defendant York's Responses to Plaintiffs' First Set of Requests for Production | 22411-22427 |
| 359-2 | Ex. 2 – Subpoena | 22428-22433 |
| 359-3 | Ex. 3 – Jason York Dep. Excerpts | 22434-22437 |
| 359-4 | Ex. 4 – Supplement Report | 22438 |
| 359-5 | Ex. 5 – Personnel Order | 22439 |
| 364 | Plaintiffs' Amended Exhibit List | 22452-22455 |
| 364-1 | Plaintiffs' Amended Exhibit List | 22456-22468 |
| 365-1 | Joe King Deposition Designations | 22471-22644 |
| 367 | Plaintiffs' Bench Memo on Admission of Certain Evidence | 22821-22824 |
| 377 | KSP Motion to Quash March 17, 2022 Subpoena | 23072-23082 |
| 377-1 | Ex. 1 – Open Records Request | 23083 |
| 377-2 | Ex. 2 – Open Records Request | 23084 |
| 377-3 | Ex. 3 – Open Records Request | 23085 |
| 377-4 | Ex. 4 – Open Records Request | 23086 |
| 377-5 | Ex. 5 – Open Records Request Stamped | 23087 |
| 377-6 | Ex. 6 – Open Records Request | 23088 |
| 377-7 | Ex. 7 – Open Records Request | 23089 |
| 377-8 | Ex. 8 – Open Records Request | 23090 |
| 377-9 | Ex. 9 – Subpoena | 23091-23093 |
| 377-10 | Ex. 10 – Open Records Request | 23094 |
| 377-11 | Ex. 11 – Response to Open Records Request | 23095-23097 |
| 377-12 | Ex. 12 – Order, *Anderson v. Knox County* | 23098-23101 |
| 377-13 | Ex. 13 – Email | 23102-23104 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 377-14 | Ex. 14 – Subpoena | 23105-23107 |
| 377-15 | Ex. 15 – Open Records Request | 23108 |
| 377-16 | Ex. 16 – Response to Open Records Request | 23109-23110 |
| 378 | KSP Motion for a Protective Order | 23112-23117 |
| 378-1 | Ex. 1 – Subpoena | 23118-23120 |
| 378-2 | Ex. 2 – Rider to Subpoena | 23121-23123 |
| 378-3 | Ex. 3 – Correspondence | 23124-23125 |
| 378-4 | Ex. 4 – Correspondence | 23126-23128 |
| 378-5 | Ex. 5 – Subpoena | 23129-23131 |
| 378-6 | Ex. 6 – Rider to Subpoena | 23132-23138 |
| 378-7 | Ex. 7 – Correspondence | 23139-23142 |
| 378-8 | Ex. 8 – Correspondence | 23143-23144 |
| 378-9 | Ex. 9 – Correspondence | 23145 |
| 378-10 | Ex. 10 – Correspondence | 23146 |
| 378-11 | Ex. 11 – Correspondence | 23147 |
| 378-12 | Ex. 12 – Correspondence | 23148-23150 |
| 378-13 | Ex. 13 – Production Receipt | 23151-23153 |
| 378-14 | Ex. 14 – Production Receipt | 23154-23156 |
| 378-15 | Ex. 15 – Production Receipt | 23157 |
| 378-16 | Ex. 16 – Production Receipt | 23158-23159 |
| 378-17 | Ex. 17 – Production Receipt | 23160-23164 |
| 378-18 | Ex. 18 – Production Receipt | 23165-23167 |
| 378-19 | Ex. 19 – Production Receipt | 23168 |
| 378-20 | Ex. 20 – Production Receipt | 23169 |
| 378-21 | Ex. 21 – Correspondence | 23170-23171 |
| 378-22 | Ex. 22 – Correspondence | 23172-23173 |
| 378-23 | Ex. 23 – Correspondence | 23174-23175 |
| 378-24 | Ex. 24 – Correspondence | 23176-23187 |
| 387 | Jury Verdict | 23832-23834 |
| 390 | Exhibit and Witness List | 23840-23845 |
| 392 | Jury Instructions | 23848-23889 |
| 394 | Juror Note | 23892 |
| 397 | Judgment | 23897-23898 |
| 399 | Motion for New Trial | 24084-24093 |
| 399-1 | Ex. 1 – Instruction | 24094 |
| 399-2 | Ex. 2 – Supplementary Report | 24095-24103 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| 399-3 | Ex. 3 – Chris Daniels Dep. | 24104-24123 |
| 399-4 | Ex. 4 – Ryan Catron Dep. | 24124-24147 |
| 399-5 | Ex. 5 – Correspondence | 24148-24149 |
| 399-6 | Ex. 6 – Jennifer Lawson Affidavit | 24150-24151 |
| 399-7 | Ex. 7 – Plaintiffs' Motion to Reconsider | 24152-24164 |
| 400 | Defendant Jason York's Response to Plaintiffs' Motion for New Trial | 24166-24178 |
| 403 | Order re: Motion for New Trial | 24265-24272 |
| 404 | Notice of Appeal | 24273-24274 |
| 410 | Final Pretrial Conference Transcript | 24295-24368 |
| 411 | **March 17, 2022 Trial** | 24369-24747 |
| | Jason York Cont. Direct Exam | 24387-24593 |
| | Jason York Cross Exam | 24593-24597 |
| | Jason York Re-Direct Exam | 24597-24611 |
| | Jackie Steele Direct Exam | 24623-24690 |
| | Jackie Steel Cross Exam | 24691-24726 |
| | Jackie Steel Re-Direct Exam | 24726-24736 |
| 412 | **March 18, 2022 Trial** | 24748-24879 |
| | Jacob Wilson Direct Exam | 24791-24785 |
| | Jacob Wilson Cross Exam | 24786-24794 |
| | Jacob Wilson Re-Direct Exam | 24795-24801 |
| | Stephen Yeary Direct Exam | 24805-24816 |
| | Stephen Yeary Cross Exam | 24816-24819 |
| | Jason York Direct Exam | 24824-24834 |
| | Jason York Cross Exam | 24834-24838 |
| | Landon King Direct Exam | 24847-24863 |
| 413 | **March 21, 2022 Trial** | 24880-25260 |
| | Charles Drago Direct Exam | 24892-24946 |
| | Charles Drago Cross Exam | 24951-24982 |
| | Charles Drago Re-Direct Exam | 24984-24993 |
| | Amber Simpson Direct Exam | 24995-25013 |
| | Amber Simpson Cross Exam | 25014-25034 |
| | Amber Simpson Re-Direct Exam | 25035-25037 |
| | Jonathan Taylor Direct Exam | 25049-25105 |
| | Jonathan Taylor Cross Exam | 25106-25140 |
| | Jonathan Taylor Re-Direct Exam | 25141-25147 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| | William Lester Direct Exam | 25149-25192 |
| | William Lester Cross Exam | 25192-25233 |
| 414 | **March 22, 2022 Trial** | 25261-25628 |
| | William Lester Cont. Cross Exam | 25275-25296 |
| | William Lester Re-Direct Exam | 25296-25319 |
| | John Pickard Direct Exam | 25319-25331 |
| | John Pickard Cross Exam | 25343-25355 |
| | John Pickard Re-Direct Exam | 25355-25359 |
| | Samuel Cox Direct Exam | 25360-25400 |
| | Samuel Cox Cross Exam | 25400-25448 |
| | Samuel Cox Re-Direct | 25449-25461 |
| | Linda Taylor Direct Exam | 25462-25477 |
| | Michael Crump Direct Exam | 25478-25483 |
| | Michael Crump Cross Exam | 25483-25491 |
| | Michael Crump Re-Direct Exam | 25491-25496 |
| | Rhonda Abner Direct Exam | 25525-25530 |
| | Rhonda Abner Cross Exam | 25530-25547 |
| 415 | **March 23, 2022 Trial** | 25629-25813 |
| | Closing Arguments by Plaintiffs | 25641-25702 |
| | Closing Arguments by Defendant | 25705-25755 |
| | Rebuttal by Plaintiffs | 25757-25768 |
| | Jury Instructions | 25769-25799 |
| 416 | **March 14, 2022 Trial** | 25814-25991 |
| | Plaintiffs' Opening Statement | 25859-25896 |
| | Defendants Opening Statement | 25896-25916 |
| | John Whitehead Direct Exam | 25921-25923 |
| | John Whitehead Cross Exam | 25923-25924 |
| | Amanda Hoskins Direct Exam | 25924-25985 |
| 417 | **March 15, 2022 Trial** | 25992-26312 |
| | Amanda Hoskins Cont. Direct Exam | 25998-26035 |
| | Amanda Hoskins Cross Exam | 26036-26127 |
| | Amanda Hoskins Re-Direct Exam | 26132-26151 |
| | Michael Cornett Direct Exam | 26151-26161 |
| | Michael Cornett Cross Exam | 26161-26167 |
| | Michael Cornett Re-Direct Exam | 26167 |
| | Jesse Lawson Direct Exam | 26168-26211 |
| | Jesse Lawson Cross Exam | 26215-26231 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| | Jesse Lawson Re-Direct Exam | 26231-26234 |
| | Allen Helton Direct Exam | 26235-26281 |
| | Allen Helton Cross Exam | 26281-26297 |
| | Allen Helton Re-Direct Exam | 26297-26301 |
| 418 | **March 16, 2022 Trial** | 26313-26670 |
| | Donna Mills Direct Exam | 26327-26381 |
| | Donna Mills Cross Exam | 26382-26408 |
| | Donna Mills Re-Direct Exam | 26408-26410 |
| | Ryan Catron Direct Exam | 26410-26442 |
| | Ryan Catron Cross Exam | 26442-26453 |
| | Ryan Catron Re-Direct Exam | 26453-26463 |
| | Ryan Catron Re-Cross Exam | 26463-26465 |
| | Lexi Hoskins Direct Exam | 26490-26504 |
| | Jason York Direct Exam | 26505-26659 |

/s/ Jon Loevy

Counsel of Record for Plaintiff-Appellants
Amanda Hoskins and Jonathan Taylor


Jon Loevy
Elliot Slosar
Amy Robinson Staples
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900